CONNECTICUT LIGHT AND POWER COMPANY ET AL. *v.* PUBLIC UTILITIES CONTROL AUTHORITY ET AL.

(four cases)

LONGO, A. ARMENTANO, RUBINOW, J. SHEA and HAMILL, Js.

Argued July 26—decision released October 3, 1978

*Alexander A. Goldfarb,* with whom, on the brief, were *Barry S. Zitser* and *Robert M. Sussler,* for the appellant (defendant Connecticut Citizen Action Group, Inc.).

*William B. Gundling,* assistant attorney general, with whom were *Robert S. Golden, Jr.,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellant (named defendant).

*Robert M. Sussler,* with whom, on the brief, were *Alexander A. Goldfarb* and *Barry S. Zitser,* for the appellants (defendants city of Hartford and town of East Lyme).

*Barry S. Zitser,* with whom, on the brief, were *Alexander A. Goldfarb* and *Robert M. Sussler,* for the appellant (defendant Office of Consumer Counsel).

*Palmer S. McGee, Jr.,* with whom were *Robert P. Knickerbocker, Jr.,* and, on the brief, *Garry H. Morton* and *M. Kuni Suzuki* for the appellees (plaintiffs).

RUBINOW, J.  On May 20, 1977, the Hartford Electric Light Company (HELCO) and the Connecticut Light and Power Company (CL&P) filed rate-increase applications with the Public Utilities

Control Authority (PUCA). In those applications, HELCO sought additional revenues of $29,450,000 and CL&P, additional revenues of $60,586,000. On October 25, 1977, after hearings held pursuant to General Statutes § 16-19 (a), the PUCA entered orders authorizing HELCO to increase its rates to produce additional estimated revenues of $12,396,000; and CL&P, additional estimated revenues of $22,637,000. On November 7, 1977, HELCO, CL&P, and Northeast Utilities (Northeast), which owns 100 percent of the common stock of HELCO and CL&P, filed in the Court of Common Pleas a petition for judicial review of those orders of the PUCA. In the proceedings on that petition, the Court of Common Pleas granted the following parties permission to enter the case as intervening defendants: Office of Consumer Counsel (Consumer Counsel);[1] East Lyme and Hartford; and Connecticut Citizen Action Group, Inc.

In the course of those proceedings in the Court of Common Pleas, Consumer Counsel filed a cross appeal to the petition for review. In the cross appeal, Consumer Counsel claimed, inter alia, that the PUCA should have dismissed the HELCO and CL&P applications, on the ground that the applications were "illegal on their face." The Court of Common Pleas overruled this claim of Consumer Counsel; sustained certain hereinafter-specified substantive claims made by the petitioners in their petition for review; and, with respect to those sustained substantive claims, rendered judgment[2]

[1] General Statutes § 16-2a (a).

[2] Practice Book § 269 requires that a judgment file be prepared if "an appeal is taken." The reason for this requirement is that the judgment file "is the only formal written statement which expresses the decision rendered." *In re Application of Title & Guaranty Co.*, 109 Conn. 45, 50, 145 A. 151 (1929). The judgment file in the instant

remanding those claims to the PUCA for further consideration. From the latter judgment and from the judgment overruling certain hereinafter-specified procedural claims, the PUCA appealed to this court; the intervening defendants appealed to this court from both of those judgments and from the judgment overruling the claim on the cross appeal that the PUCA ought to have dismissed the applications.

## I

The claim that the PUCA should have dismissed the applications is based on a provision in General Statutes § 16-19 (a) directing public service companies to file with the PUCA proposed amendments of their "existing rates."[3] Consumer Counsel claimed, in asking the PUCA to dismiss the applications, that, when HELCO and CL&P filed their rate-increase applications, there were no "existing rates" because litigation was then pending concerning the rates that HELCO and CL&P could lawfully charge.

That litigation arose out of orders entered on October 7, 1974, by the Public Utilities Commission (PUC), the predecessor to the PUCA, in Docket Nos. 11552 and 11553, which were rate-increase

case is deficient because it contains no reference to the decision rendered by the trial court on several issues that have been made the subject of appeal. Because none of the parties has objected to our consideration of those issues, notwithstanding the deficiencies of the judgment file, and because the resolution of those issues affects the public interest in the regulation of public utilities, we have considered those issues even though the judgment file was not properly prepared. See *Harris* v. *First National Bank & Trust Co.*, 139 Conn. 749, 752, 97 A.2d 260 (1953).

[3] "Each public service company shall file any proposed amendment of its existing rates with the authority in such form and in accordance with such reasonable regulations as the authority may prescribe."

applications of CL&P and HELCO, respectively; and on December 22, 1976, by the PUCA, in Docket Nos. 760604 and 760605, which were rate-increase applications of CL&P and HELCO, respectively. The 1974 applications resulted in PUC decisions authorizing a rate increase; the 1976 applications resulted in PUCA decisions ordering a rate decrease. Appeals were taken from both the PUC and the PUCA decisions, and, when the subject 1977 applications were filed, those appeals were still pending.

In connection with those appeals, this court entered orders in *Hartford* v. *Hartford Electric Light Co.,* 172 Conn. 13, 372 A.2d 130 (1976); s.c., 172 Conn. 71, 372 A.2d 131 (1976); and 173 Conn. 340, 377 A.2d 1090 (1977). In the latter opinion, we referred[4] to a "Stipulation of Compromise and Settlement" dated May 12, 1977. This stipulation, which was approved by the PUCA[5] on May 12, 1977, with respect to the orders in Docket Nos. 760604 and 760605, contains an agreement to terminate all the litigation concerning the decisions of the PUCA in those docket numbers, and the decisions of the PUC in Docket Nos. 11552 and 11553. The rate schedule authorized by that stipulation was not formally approved, however, by the PUCA[6] until May 31, 1977, eleven days after HELCO and CL&P had filed the subject 1977 applications.

The rates that HELCO and CL&P were charging when those applications were filed were the rates authorized by the 1974 PUC decisions. Although

---

[4] *Hartford* v. *Hartford Electric Light Co.,* 173 Conn. 340, 343, 377 A.2d 1090 (1977).

[5] Docket Nos. 760604 and 760605, decisions of May 12, 1977.

[6] Docket No. 760605, Third Supplemental Decision of May 31, 1977.

the Court of Common Pleas had declared those rates invalid, a subsequent interlocutory ruling of that court permitted HELCO and CL&P to charge those rates while appeals from the PUC and PUCA decisions were pending. Those 1974 rates are not "existing rates," the intervening defendants claim, because, first, they had been declared invalid by the Court of Common Pleas and, second, inasmuch as the PUCA had ordered a decrease in rates in 1976, the 1974 rates were not "existing rates" in 1977.

This question about the meaning of "existing rates" had arisen in the course of the PUCA's proceedings on the 1976 applications. In those proceedings, the claim was made that the PUCA lacked jurisdiction to entertain the 1976 applications "because the Companies' prior rate schedules, approved in Commission Dockets Nos. 11552 and 11553, have been declared invalid by a trial court."[7] The PUCA overruled this claim, saying, "The General Assembly clearly did not intend that the Authority's power over rates should be so limited; indeed, it appears in Title 16 that the General Assembly intended . . . the Authority to possess plenary power over public service companies' rates at all times."[8] The PUCA expressly construed "existing rates" to mean the rates in effect, i.e., the rates being charged by the public service company at the time the application was filed to amend the "existing rates."[9]

After this formal finding by the PUCA that the General Assembly intended "existing rates" to mean "rates-being-charged," there were two sessions of

[7] Docket No. 760605, December 22, 1976, p. 50.
[8] Id., p. 51.
[9] Id., p. 50.

the General Assembly, the 1977 session and the 1978 session. In neither of these sessions did the General Assembly pass any legislation designed to show a legislative intention different from that found by the PUCA; yet, in 1977, the General Assembly amended the sentence in which the phrase "existing rates" occurs, but left that phrase intact. See Public Acts 1977, No. 77-121. There are thus present in this case two significant aids to the proper determination of what the General Assembly meant by "existing rates" in General Statutes § 16-19 (a). The first is the interpretation by the PUCA. "The practical interpretation of legislative acts by governmental agencies responsible for their administration is a recognized aid to statutory construction." *State ex rel. James* v. *Rapport,* 136 Conn. 177, 182, 69 A.2d 645 (1949). See *Roy* v. *Centennial Ins. Co.,* 171 Conn. 463, 473, 370 A.2d 1011 (1976) (in construing statutes, courts are to accord "great deference" to construction given to the statute by the agency charged with enforcing it). The second is the inference of legislative concurrence with the agency's interpretation to be drawn from legislative silence concerning that interpretation, especially where the legislature makes unrelated amendments in the same statute. See *Anderson* v. *Ludgin,* 175 Conn. 545, 555, 400 A.2d 712 (1978).

Because there is in the record no testimonial evidence that the members of the General Assembly were informed of the PUCA's interpretation, it might be argued that the inference of legislative concurrence should not be drawn from the legislative silence. See 2A Sutherland, Statutes and Statutory Construction (4th Ed. 1973) § 49.10, p. 261 (acquiescence of legislature may be of "small consequence" where there is no evidence that the statute or inter-

pretation was called to the legislature's attention).
An argument to that effect in the present case, how-
ever, would not be taking into account the legisla-
tive interest in the issue resolved by the PUCA's
interpretation or the circumstances that led to that
interpretation. The issue concerned the basic step
in public-utility rate-making procedure, a subject
that the General Assembly had treated extensively
in 1975. See Public Acts 1975, No. 75-486. Further,
the PUCA's interpretation occurred in the course
of extended contested hearings about the public-
utility rates to be charged in areas where approxi-
mately two-thirds of the citizens of the state reside.[10]
Because the PUCA's interpretation affects so many
of the state's citizens,[11] and because of the interest
evidenced by the 1975 General Assembly in public-
utility rate-regulation proceedings, we may not
assume that the members of the General Assembly
in 1977 and 1978 were unaware of, or ignored, the
PUCA's interpretation. We, therefore, construe the
legislative silence as legislative concurrence in that
interpretation. That legislative concurrence is "pre-
sumptive evidence" of the correctness of the admin-
istrative interpretation. 2A Sutherland, op. cit.,
pp. 261–62. This "presumptive evidence" of correct-
ness we add to the persuasive effect normally given
to an administrative interpretation. Coupled, these
two considerations outweigh any arguments that
might be advanced for a contrary interpretation.

---

[10] HELCO furnishes electric service in an area where approximately
788,000 people reside. Docket No. 760605, December 22, 1976, p. 4.
CL&P furnishes electric service in an area where approximately
1,437,000 people reside. Docket No. 760604, December 22, 1976, p. 4.

[11] There were twenty-three days of public hearings on the 1976
applications. Docket No. 760604, December 22, 1976, p. 1. The
admitted intervenors included one state representative, ten munici-
palities, and twenty-one other parties. Id., pp. 2–4.

Accordingly, we sustain the trial court's ruling, on Consumer Counsel's cross appeal, that the PUCA had jurisdiction over the subject applications.[12]

## II

The defendants have made two other procedural claims. The first is that Northeast is not a proper party to the petition for review because it was not a party to the proceedings before the PUCA; had not exhausted its administrative remedies; and, therefore, had no standing, under General Statutes § 4-183, to be a party to the petition for review. This claim was asserted in the trial court in pleas in abatement and in motions to erase.

Because both HELCO and CL&P were proper parties to the petition, any procedural irregularity arising from the presence of Northeast as a petitioning party would constitute only a misjoinder of parties. The "exclusive remedy" for misjoinder of parties is a motion that the improperly-joined party be dropped as a party. Practice Book, 1963, § 157; *Hartford* v. *Local 308,* 171 Conn. 420, 429, 370 A.2d 996 (1976). Because that motion is the "exclusive remedy," the trial court did not err in overruling any misjoinder claims asserted in either a plea in abatement or a motion to erase. *Hartford* v. *Local 308,* supra.

Further, because Northeast was represented by the same counsel as HELCO and CL&P, and filed pleadings, and participated in the proceedings, only

---

[12] The applications originally proposed that the new rates become effective on May 1, 1977. In response to a claim by Consumer Counsel that making the rates effective on May 1, 1977, would be invalid because any increases would then antedate the date the applications were filed, the PUCA ordered the applications amended to include only service rendered after May 31, 1977. This amendment was filed. The order to amend the application was authorized by Regs., Conn. State Agencies, § 16-1-50, and was proper.

jointly with HELCO and CL&P, and because the issues in this case are resolved entirely on the record[13] of the proceedings concerning the applications of HELCO and CL&P, the defendants were not harmed by the action of the trial court in permitting Northeast to remain as a petitioning party, even if Northeast were improperly joined as a petitioning plaintiff.

The other procedural claim of the defendants is that HELCO and CL&P, by filing rate-increase schedules in accordance with the limited rate-increase authorized by the PUCA order of October 25, 1977, waived their right to institute, and are estopped from maintaining, an appeal from so much of the PUCA order as denied to HELCO and CL&P the full amount of the increase requested in their applications. The defendants claim that a public utility may not accept the benefits of an authorized, but limited, rate-increase and, at the same time, appeal on the ground that a larger increase should have been granted.

This claim is based upon the general rule that " '(t)he right to accept the fruits of a judgment or order, and the right to appeal therefrom, are not concurrent, but are wholly inconsistent, and an election of either is a waiver and renunciation of the other.' " Annot., 169 A.L.R. 985, 988 (1947). That rule, however, is subject to numerous exceptions. Id., p. 1055 et seq.; see, e.g., *Cherokee Nation* v. *United States,* 355 F.2d 945, 949 (Ct. Cl. 1966) (rule not applicable where benefits are accepted "under circumstances of strong compulsion and financial duress").

---

[13] General Statutes § 4-183 (f). "The appeal [on a petition for judicial review] shall be conducted by the court without a jury and shall be confined to the record. . . ."

Further, the rule has ordinarily not been invoked in, or held applicable to, appeals from public-utility rate-regulation orders. Thus, in *Chesapeake & Potomac Telephone Co.* v. *Public Service Commission,* 201 Md. 170, 177, 93 A.2d 249 (1952), the court cited cases in several jurisdictions where "without challenge" the practice was to permit appeals even though the limited rate-orders had been implemented. In accord with that practice, the court held that a public utility has the right to implement an authorized rate schedule and, also, to appeal. That holding was cited and followed in *New England Telephone & Telegraph Co.* v. *Kennelly,* 80 R.I. 253, 95 A.2d 886 (1953).

Similarly, in *Department of Public Utilities* v. *New England Telephone & Telegraph Co.,* 325 Mass. 281, 90 N.E.2d 328 (1950), the court found that the public utility did not waive, or otherwise lose, its right to appeal by putting increased rates into effect. The court noted that the public utility has a right to insist upon having the constitutionality of the regulatory order passed upon by a court of last resort, and that the rate increase allowed could not have been made "conditional upon the company's abandonment of constitutional rights."[14] The court also specifically rejected[15] the claim of waiver-by-appeal, saying, "Waiver is commonly defined as the intentional relinquishment of a known right. The company asserted and insisted upon its rights in the clearest terms at every stage of the proceedings. . . . It insisted at all times that the increases allowed by the [regulatory agency] were inadequate, and that the rates as allowed were confisca-

---

[14] *Department of Public Utilities* v. *New England Telephone & Telegraph Co.,* 325 Mass. 281, 291–92, 90 N.E.2d 328 (1950).
[15] Id., p. 292.

tory. . . . Each order made and each rate filed (whether in pursuance of an order or of a suggestion or permission) . . . was made or filed subject to the right of the company to have this court pass upon that order, and . . . . [to allow higher rates] if lower rates should be found confiscatory and unconstitutional." The holding and reasoning of this case represent the weight of authority on this procedural issue.

There is one further consideration. Under General Statutes § 16-41, HELCO and CL&P, and its officers, are under a duty to "obey, observe and comply with each order" made by the PUCA. That section further provides for a fine of not more than $20,000 for failure to comply with an order of the authority made "in accordance with the provisions of" General Statutes § 16-19. In accordance with those provisions, the PUCA, as part of its 1977 decisions on the applications of HELCO and CL&P, ordered that HELCO and CL&P "shall file a schedule of rates which produce on an annual basis the total revenues authorized by" the PUCA decision.[16] If complying with that order waives the right to appeal, a public utility desiring to appeal is caught between the Scylla of violating the order of the PUCA if it does not file the schedule, and the Charybdis of losing its right to appeal if it does file the schedule. We will not read that bizarre result[17] into either General Statutes § 16-19 or General Statutes § 16-35, the appeal statute,[18] and neither those statutes nor any others contain any express language requiring that result.[19] Accord-

---

[16] Docket No. 770319, p. 59; Docket No. 770320, p. 59.

[17] See *Sillman* v. *Sillman*, 168 Conn. 144, 149, 358 A.2d 150 (1975).

[18] As amended by Public Acts 1977, No. 77-603, § 41.

[19] Cf. *Board of Trustees* v. *Public Service Commission*, 147 Ind. App. 404, 261 N.E.2d 373 (1970).

ingly, we adopt both the reasoning and holding of the cases constituting the weight of authority on this procedural issue; we hold that, by filing the schedule of rates ordered by the PUCA, HELCO and CL&P did not waive their right to appeal and are not estopped from maintaining their appeal; and we affirm the action of the trial court in overruling the defendants' claims of waiver and estoppel.

## III

In its 1977 decisions, the PUCA found that a fair rate of return on the rate base of CL&P is 9.19 percent, which includes an allowance for a rate of return of approximately 13.0 percent on the common equity;[20] and that a fair rate of return on the rate base of HELCO is 9.44 percent, which also includes an allowance for a rate of return of approximately 13.0 percent on the common equity.[21] In their petition for review, HELCO and CL&P make the claim that the PUCA "wrongfully and unreasonably limited the Companies to a 13.0 percent return on equity." In the cross appeal, Consumer Counsel makes the claim that the PUCA allowed HELCO and CL&P too high a rate of return. The Court of Common Pleas overruled those claims, and none of the parties has appealed from that ruling. Hence, for the purposes of this appeal, the rate of return allowed HELCO and CL&P by the PUCA meets both the statutory requirements set forth in General Statutes § 16-19e (a) (4) and the constitutional requirement that a utility must not be "deprived of a fair return for the service rendered to the public in the use of the [utility's] property." *Los Angeles*

[20] Docket No. 770319, pp. 56, 58.
[21] Docket No. 770320, p. 56.

*Gas & Electric Corporation Co.* v. *Railroad Commission,* 289 U.S. 287, 305, 53 S. Ct. 637, 77 L. Ed. 1180 (1933).

Although the Court of Common Pleas did not order the PUCA to change the rate of return allowed HELCO and CL&P, the court did order the PUCA, in determining what revenues are necessary to yield that allowed rate of return, to reconsider a request made by HELCO and CL&P to the PUCA for an allowance for "attrition in earnings." As used in the request to the PUCA, the phrase "attrition in earnings" refers to the tendency, in times of inflation, for the earnings of public utilities to be less than the earnings allowed by the regulatory agency. An inflationary environment tends to produce this attrition in earnings for two reasons: first, during the time required to prepare, hold hearings on, and render decisions on, an application for a rate increase, the utility usually continues to charge only according to the rates previously fixed, even though, during that time, as a result of inflation, the rate base and operating expenses tend to increase faster than revenues; second, because rates-to-be-charged are ordinarily based upon the rate base and operating expenses of a prior year, selected as a test year,[22] that rate base and those operating expenses reflect a lower price level, so that, even after the new rates go into effect, the rate base and operating expenses tend to increase faster than revenues.

In the proceedings before the PUCA, HELCO and CL&P requested the PUCA to make an allowance for attrition in the amount of .35 percent of the rate base. To prove the need for an allowance in

---

[22] Regs., Conn. State Agencies, § 16-1-54.

that amount, HELCO and CL&P introduced the testimony of experts and submitted several exhibits. One of those exhibits shows the return on common equity that HELCO and CL&P had been allowed on the basis of the rates approved in each PUC decision rendered from 1970 to 1974, and, in contrast, the return on common equity that HELCO and CL&P would have earned if those rates had not been increased during the year after the effective date of the decision. On that assumed set of facts, that exhibit showed that during the years 1971 through 1975, the earnings of both HELCO and CL&P would not have achieved the rate of return allowed by the PUC. In the case of HELCO, the difference between the allowed rate of return and the earned rate of return would have ranged between 2.5 percent and 5.63 percent; in the case of CL&P, between 2.85 percent and 7.14 percent.

In its memorandum of decision,[23] the trial court stated that "these statistics" evidenced a "consistent, significant, discernible short fall in the rate of return" that has "deprived each of these companies for the preceding five years of the level of earnings determined appropriate for them through the regulatory process"; that the response of the PUCA "to a short fall of the magnitude and demonstrated persistence shown here, does not meet statutory or constitutional requirements"; and that the PUCA should reconsider the attrition issue to develop "a more direct solution to the attrition problem in order to furnish the companies a fair opportunity

[23] We have ascertained from the trial court's memorandum of decision the basis for the trial court's judgment that the PUCA erred in its treatment of the attrition issue. See *Hartford Electric Applicators of Thermalux, Inc.* v. *Alden*, 169 Conn. 177, 185 n.3, 363 A.2d 135 (1975).

of achieving the rate of return authorized for them."
There are two reasons why the trial court erred
in using "these statistics" as the ground for remand-
ing the attrition issue to the PUCA.

First. The record[24] shows that the "statistics" in
the exhibit do not take into account any interim or
permanent rate-increases that occurred during the
first year that the rates shown in the exhibit were
in effect. As explained in the brief of HELCO and
CL&P, the reason for omitting the rate-increases is
that "the purpose of the Exhibits . . . was to show
the amount of attrition not being provided for in
the respective rate proceedings."[25]  Nevertheless,
those increases would have tended to increase rev-
enues, and, correlatively, to reduce, or even elim-
inate, any difference between the amount allowed
and the amount earned.

The importance to the attrition issue of actual
earnings, rather than theoretical earnings, can be
readily demonstrated. If, for example, the "statis-
tics" in the exhibit had shown that there had been
no "short fall" in actual earnings, there would then
have been no basis for a claim that past "short falls"
proved that an attrition allowance was necessary
to prevent future "short falls."  Conversely, the
absence of any past "short falls" in actual earnings
would tend to prove that, notwithstanding the infla-
tionary environment, either the normal increase in
power consumption or a responsive regulatory
process, or a combination of both, is sufficient to
prevent a "short fall."  Without proof of a "short
fall" in actual earnings, the trial court should not
have concluded that the hypothetical "statistics" in
the exhibit proved the extent of the "short fall."

---

[24] See footnote 13.

[25] HELCO and CL&P Brief, p. 8.

Second. "Although a failure to earn the authorized rate of return is evidence of attrition, it is not conclusive. *Public Service Commission* v. *Baltimore Gas and Electric Co.*, 273 Md. 357, 329 A.2d 691 (1974). The differences between the permitted and earned rates of return could have been due to a variety of factors. Attrition and regulatory lag were only possible explanations." *Maine Water Co.* v. *Public Utilities Commission*, 388 A.2d 493, 497 (Me. 1978). In the case of both HELCO and CL&P, there was a "variety of factors," other than attrition, that caused substantial decreases in their earnings. These other factors include: (a) an outage in 1973 in the Millstone Unit I, a nuclear power-generating plant; (b) a severe ice storm in 1973 (sometimes locally referred to as Storm Felix); and (c) a business recession between 1973 and 1975. "An authorized rate of return is not a guarantee of any level of revenues or return." *Public Service Commission* v. *Baltimore Gas & Electric Co.*, 273 Md. 357, 369, 329 A.2d 691 (1974).

We can only speculate how much greater the earnings of HELCO and CL&P would have been had the recession not occurred. We do not have to speculate, however, concerning the expenses of Storm Felix and the Millstone I outage. For the expenses of the storm, during the three-year period commencing December 1, 1973, HELCO was allowed to amortize $1,029,457 annually and CL&P, $1,690,359 annually. For the expenses of the Millstone outage, during the five-year period commencing January 1, 1973, HELCO was allowed to amortize $1,160,000 annually and CL&P, $2,127,000 annually. The "statistics" relied on by the trial court did not take into account the amount of these additional expenses, none of which can be attributed

to the inflationary environment. Although the PUC ruled that these expenses could be amortized, that ruling does not make those additional expenses the result of inflation. To the extent that the "short fall" was the result of these additional expenses, the "short fall" was not due to attrition in earnings, and the trial court erred in not taking those additional expenses into account in determining whether the PUCA had adequately considered the attrition problem.

## IV

Notwithstanding the inconclusive proof as to the extent of any past "short falls," the PUCA, in its 1977 decisions, makes express reference to the problem of attrition and allowances made by the PUCA to compensate for the effects of inflation on expenses. Even if, as claimed by HELCO and CL&P, this reference and the allowances constitute tacit recognition of the need for the PUCA to make an allowance for attrition in earnings, it does not follow that the allowance has to be made in the form of an added specific percentage of the rate base. Permissible methods of making an adjustment for attrition include "[u]se of a year-end rate base, *New England Telephone & Telegraph Co.* v. *State,* 113 N.H. 92, 302 A.2d 814 (1973), bringing expenses up to date, *Public Service Commission* v. *Baltimore Gas and Electric Co.* [273 Md. 357, 329 A.2d 691 (1974)], and increasing the otherwise allowable rate of return through an adjustment in the cost of equity, *New England Telephone and Telegraph Co.* v. *Public Utilities Commission,* 116 R.I. 356, 358 A.2d 1 (1976)." *Maine Water Co.* v. *Public Utilities Commission,* 388 A.2d 493, 498 (Me. 1978).

The PUCA utilized both of the first two suggested methods. With respect to the year-end base, the PUCA stated, as part of its discussion of the problem of attrition, "[W]e have used a year-end rate base. It is generally recognized that a year-end rate base tends to constitute an offset to, or an adjustment in lieu of, an attrition allowance, which use of an average rate base would not."[26]

An alternative to the use of the year-end rate base would have been to use a rate base estimated to be the average rate base during the period the new rates would have been in force. To arrive at that estimated rate base would require estimates as to the duration of that period and, also, as to the course and cost of the construction that would properly be added to the rate base during that time. Rate-base determination by the use of those estimates is feasible but not mandatory. In the absence of a statute requiring the PUCA to attempt to make such an estimate, however, the use of the year-end rate base was a permissible response by the PUCA to the possibility of earnings-attrition. The year-end-rate-base response has been administratively and judicially approved in other jurisdictions, and the trial court erred insofar as the trial court held that the response was not adequate and direct. See *Boston Gas Co.* v. *Department of Public Utilities,* 359 Mass. 292, 309, 269 N.E.2d 248 (1971) (utility official proposed use of year-end rate base as "workable approximation" adjustment, "widely accepted" for "counteracting attrition"; cases cited recognizing year-end rate base as an acceptable "imprecise method of taking account of attrition").

---

[26] Docket No. 770319, p. 50; Docket No. 770320, p. 50.

The PUCA also utilized "bringing-expenses-to-date" to make adjustments for attrition. These adjustments were made by accepting most of the proposed expenses claimed by HELCO and CL&P in their applications, as modified by additional exhibits filed by HELCO and CL&P to adjust certain of its "proposed expenses for pro forma purposes . . . to reflect known changes which had been incurred by the Company since the original filing of the application."[27] Subject to certain exceptions not relevant to the attrition issue, the PUCA ruled that "[t]he pro forma expenses claimed by the Company are acceptable for determining the Company's revenue requirements at this time."[28] Having thus accepted, for rate-making purposes, the proposed expenses claimed by both HELCO and CL&P, the PUCA said, in its discussion of attrition, "We have in this case adjusted expenses for all known changes. Furthermore, we have used a year-end rate base. . . . Thus it would appear that the source of attrition that has not been specifically accounted for is limited to the unpredictable residual amount of anticipated expense increases for which no pro forma adjustment has been requested or made." Docket No. 770319, p. 50; Docket No. 770320, p. 50.

HELCO and CL&P claim, on two grounds, that this response of the PUCA to the attrition problem is not adequate. The first ground is that the same methods of meeting the attrition problem "have been used for most or all of the period since 1970 during which the Companies have experienced their drastic short falls from allowed rates of return."[29] This ground is untenable; as noted previ-

[27] Docket No. 770319, p. 37; Docket No. 770320, p. 38.
[28] Ibid.
[29] HELCO and CL&P Brief, p. 21.

ously, the "short fall" alleged is hypothetical, not actual, and there is no evidence of its actual extent, let alone the extent to which the PUCA adjustments were effective in reducing it.

The second ground is a claim that the PUCA's "failure . . . to deal directly or meaningfully with attrition experienced by the Companies is explained in its third paragraph [on attrition]: 'We do not believe an attrition allowance is advisable. As an economic policy it encourages, reinforces and virtually guarantees the very evil it is designed to ameliorate, i.e., the effects of inflation. Docket No. 770320 at 50.' "[30] In making this claim, HELCO and CL&P have misconstrued the tenor of the PUCA's quoted comment concerning an "attrition allowance." Because the PUCA, in its decisions, specifically considered and made allowances for attrition, the statement, "We do not believe an attrition allowance is advisable," cannot logically be construed as meaning that the PUCA has a policy of not considering attrition and not making an allowance for it. Rather, the tenor of the statement is that the PUCA has a policy of not making a blanket attrition allowance of the kind requested by HELCO and CL&P. As is evident from the PUCA's treatment of the attrition issue, the PUCA policy is to use methods that are alternatives to adding on a specific percentage of the rate base. These alternative methods are direct and adequate means of dealing with the attrition problem. The claims of HELCO and CL&P, and the ruling of the trial court, to the contrary are overruled.

---

[30] HELCO and CL&P Brief, p. 16.

## V

As noted previously, the PUCA authorized HELCO and CL&P to amortize the expenses incurred as a result of Storm Felix and the Millstone I outage. On the books of HELCO and CL&P, the amortization period for Storm Felix expired in December, 1976, and for the Millstone I outage, in December, 1977. In its 1977 decisions, the PUCA disallowed as an expense the amounts claimed as amortization of Storm Felix expenses and Millstone I expenses. The grounds given for the disallowance of the Storm Felix amortization are that: (a) the expenses were completely amortized on the books of the company as of December, 1976, and (b) the amortization was disallowed previously on December 22, 1976, in Docket Nos. 760604 and 760605. The ground given for the disallowance of the Millstone I expenses is that the expenses would be completely amortized on the books of the utilities as of December, 1977.[31] HELCO and CL&P claimed, in their petition for review, that the PUCA erred in disallowing these amortized expenses. The trial court sustained this claim, except as to any claim previously disallowed in Docket Nos. 760604 and 760605.

With respect to this issue, the claim of HELCO and CL&P is that they are entitled to recover fully as an expense the amount of amortization allowed, and that the amortization process does not begin, for rate-making purposes, until the amortization is first claimed, for rate-making purposes, as an expense in a test year. The defendants claim that the amortization period coincides with the period during which the amortization is proceeding on the

---

[31] Docket No. 770319, pp. 38, 41; Docket No. 770320, pp. 39, 41.

books of the utility, and that the right to claim the amortization as an expense terminates when the amortization has been completed on those books.

The proper resolution of these conflicting claims begins with an inquiry into the purpose of the action of the PUCA in authorizing amortization of these expenses. By authorizing amortization of the expenses, the PUCA implicitly finds that HELCO and CL&P may properly include the expense as an expense for rate-making purposes; otherwise there would be no purpose for seeking, and granting, the authorization. The PUCA also implicitly finds, however, that, for rate-making purposes, all of the expense should not be included as an expense in one year.

One obvious reason for not permitting all of the expense to be included as an expense, for rate-making purposes, in one year is that otherwise customers might be faced with a sudden and precipitous rise in rates. Amortization permits any rate-increase attributable to the amortizable expense to be spread over the period of amortization. The ultimate purpose of the amortization authorization is oriented toward the rate-making process, not the internal bookkeeping of the company.[32]

Because the ultimate purpose of authorizing amortization is to enable the utility to claim the amortizable expense in rate-making proceedings, the ruling of the PUCA that amortization would not be allowed if the expenses had been fully amortized on the books of the company is inconsistent with

[32] The PUCA's letter of January 30, 1974, relative to amortization of Storm Felix expenses specifically referred to the rate-making aspect in these words: "It should be noted, however, that rate-making treatment of this matter can only be adjudicated in formal rate-making proceedings." HELCO and CL&P appendix, p. 246a.

the purpose of its order authorizing amortization. Because of that inconsistency, the ruling is "arbitrary" within the purview of General Statutes § 4-183 (g) (6).

On the other hand, the amortization authorization should not be construed to permit the utilities to delay unreasonably the time when the amortization is first claimed for rate-making purposes. To permit that "would have produced the unjust effect of imposing the burden of costs incurred [at an earlier date] on . . . users [at a later date] and thereafter." *Petition of New England Telephone & Telegraph Co.,* 120 Vt. 181, 186, 136 A.2d 357 (1957). The determination of the time when the amortization period begins to run, for rate-making purposes, is a matter that, in the absence of a statute or regulation or order specifically making that determination, has to be left to the sound discretion of the PUCA, to be exercised under the guidelines in General Statutes § 16-19e. Accordingly, we affirm the order of the trial court remanding to the PUCA, for further consideration, the issue of the extent, if any, to which amortization of expenses of Storm Felix and the Millstone I outage should have been allowed in connection with the 1977 applications. As suggested by the trial court, in that further consideration, the PUCA may consider the extent, if any, to which the rule in *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699, is applicable to the issue.

## VI

In 1973, the PUC authorized HELCO and CL&P to amortize certain expenses for fuel. At the time the 1977 decisions of the PUCA were to become

effective, the amortization period for those expenses had approximately two months to run, and there was approximately $373,000 remaining to be amortized ($112,000 for HELCO and $261,000 for CL&P). In its 1977 decisions, the PUCA disallowed the remaining amortization on two grounds: first, that the amounts involved were de minimis and second, that two months was too short a period to make an adjustment for.[33]

The first of these grounds is untenable. Although the amounts disallowed are small in comparison to the increased revenues allowed, the amounts disallowed are substantial. Further, the fuel costs are clearly "operating costs," and the order of the PUCA disallowing the remaining amortization of those fuel costs is contrary to the express declaration in General Statutes § 16-19e (a) (4) that the level of rates shall be sufficient to "cover . . . operating . . . costs." The rates are not sufficient if "operating costs" are disallowed, regardless of the amount disallowed.

The second ground is likewise untenable. Although only two months of amortization remained, the PUCA could follow in this case the same procedure that it followed in Docket No. 770720.[34] In that case, the PUCA estimated that the new rates would be in effect for two years. The amortization period was scheduled to expire before that time. The PUCA ruled, "In consideration of this, we will provide for the amortization of these items over a two-year period computed on the unamortized balances as of January 31, 1978."[35]

---

[33] Docket No. 770319, p. 38; Docket No. 770320, p. 39.

[34] The Southern Connecticut Gas Company, decision of February 1, 1978.

[35] Id., p. 36.

This procedure permits the utility to recover its authorized amortization and, at the same time, does not require an adjustment of the rates at the expiration of the amortization period. The trial court correctly ruled that the disallowance of the deferred fuel cost amortization was arbitrary, and we affirm that ruling.

## VII

In 1976, the PUCA authorized HELCO and CL&P to accrue depreciation on Millstone Unit I and on Millstone Unit II, another nuclear power-generating plant, at a rate that will amount to 110 percent of their original cost. The additional 10 percent was allowed on the theory that, at the end of the estimated useful lives of those units, the cost of removing them would exceed their salvage value by that 10 percent. That excess of cost of removal over salvage value is referred to as "negative salvage value." The net result of this allowance for negative salvage value is that HELCO and CL&P are being permitted to amortize presently an expense they will not incur until some future time.

To ensure that HELCO and CL&P will, in the future, do the removal work that is the basis for the negative salvage allowance, the PUCA entered an order that provides, in effect, that HELCO and CL&P shall furnish a performance bond conditioned on their decommissioning Millstone I and Millstone II. The order was based on the following decision of the PUCA: "This decision provides in the provision for depreciation an allowance for negative salvage of Millstone I and II. To the extent that such advance accumulation accrues on the books of the Company at the end of each calendar year, the Company within 60 days thereafter will be obliged to

file with the PUCA a corporate surety bond in form and substance satisfactory to the Authority which will guarantee that the funds so accrued, together with interest calculated at the Company's average short term borrowing rate for the year then ended, shall be used toward the ultimate costs of decommissioning Millstone I and II."[36]

HELCO and CL&P do not object to the requirement that they post a bond to ensure that they will pay for the decommissioning. They do object, however, to the amount of the bond required by the PUCA, particularly to that part of the amount that is mandated by the provision with respect to interest. If the amount of the bond had been confined to the cumulative amount allowed, determined annually, as extra depreciation for negative salvage value, at the estimated decommissioning time the amount of the bond would equal the amount that the PUCA had determined was necessary to pay for the decommissioning expense, i.e., 10 percent of the original cost of the unit.

When the PUCA order added the element of interest, however, it increased the potential amount of the bond to an amount that might be several times the decommissioning expense. For example, if we assume the "average short term borrowing rate" to be 8 1/3 percent, in twelve years the amount of the bond would be double the amount of the negative salvage allowance. Because the purpose of the bond is to ensure that HELCO and CL&P pay the estimated decommissioning expense, amounting to the estimated 10 percent of the original cost, there is no obvious explanation why the potential amount of the bond should be some multiple of that expense.

[36] Docket No. 770319, p. 45; Docket No. 770320, p. 45.

If the explanation is that the PUCA believes the decommissioning expense will exceed the 10 percent allowed under its previous order, then HELCO and CL&P are in a position to claim a negative salvage allowance greater than that presently being allowed. Whatever may be the reason why the PUCA added the interest element, because of the incongruity between that element and the present allowance, HELCO and CL&P should have been given notice of the proposed addition of the interest element, and under General Statutes § 4-177 (c), given "[o]pportunity . . . to respond and present evidence and argument" on the specific issue of the amount of the bond. Accordingly, we affirm the holding of the trial court vacating the order of the PUCA with respect to the filing of the corporate surety bond.

Because the PUCA may order further proceedings with respect to a bond, we point out, in an attempt to forestall further litigation, that we concur in the observation of the trial court that the present order is "confusing." The words "funds so accrued" have not been interpreted in the same way by parties to this proceeding. What the Supreme Court of the United States said in *Federal Trade Commission* v. *Henry Broch & Co.*, 368 U.S. 360, 367–68, 82 S. Ct. 431, 7 L. Ed. 2d 353 (1962), is applicable to the present order: "The severity of possible penalties prescribed . . . for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application."[37]

---

[37] In *Broch* the penalty was not more than $5000 for each violation, and each day that the violation continued constituted a separate violation. Under General Statutes § 16-41, for violations of orders of the PUCA made under General Statutes § 16-19, the fine is not more

## VIII

There is error in part; the case is remanded to the Superior Court[38] with direction to modify the judgment of the Court of Common Pleas in accordance with this opinion.

No costs will be taxed to any party.

In this opinion the other judges concurred.

than $20,000, and for violations of other sections, not more than $5000. In case of continuing violations, "each day thereof shall be deemed a separate offense."

[38] See General Statutes § 51-164s.