[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is an administrative appeal brought by the Office of Consumer Counsel ("OCC") challenging a decision by the Department of Public Utility Control ("DPUC") regarding interim over-earnings by the Connecticut Light and Power Company ("CLP").[1]
The OCC is authorized by General Statutes § 16-2a to advocate for consumer interests in public utility matters. CLP is a public service company, pursuant to General Statutes §16-1, subject to regulation by the DPUC.
Connecticut law requires the DPUC to periodically review rates of public service companies, such as CLP, to determine if such rates are just, reasonable and adequate. In another decision involving CLP rates, the DPUC determined that there were likely to be over-earnings of approximately $291 million dollars. The over-earnings were addressed in a two part process. The underlying decision in this case represents approximately $141 million of over-earnings. The balance of approximately $150 million is being addressed in a full rate case. This case is an interim rate decrease pursuant to General Statutes § 16-19
(g).[2]
CT Page 1409
The $141 million over-earnings are corrected on an interim basis by removing $30.5 million from rates and making accounting adjustments for the $110.5 balance. The $110.5 million was removed from CLP rates on an annual basis by accelerating amortization of two regulatory assets; $100.5 million in tax liabilities and $10 million in conservation costs.
The OCC does not challenge the removal of the $30.5 million from the rate base. The OCC questions the DPUC decision in allowing CLP to keep the $100.5 million in over-earnings by means of accounting adjustments in the form of accelerating the amortization of regulatory assets. OCC maintains that the interim rate decrease statute, § 16-19(9), requires an actual rate reduction and thus the DPUC decision violates such statutes. CLP accepts the DPUC decision.
The court finds that the DPUC, in this case, acted in accordance with § 16-19(9) by adjusting the interim over-earnings through accelerated amortization of regulated assets.
At the time of the decision, CLP faced serious financial difficulties. Three nuclear power plants had been shutdown by the Nuclear Regulatory Commission ("NRC"). CLP had experienced, at the date of the DPUC decision, approximately $1 billion of costs related to the Millstone Nuclear outages, a large measure of the responsibility for the outages and costs is attributable to CLP's imprudent management. (D.P. 10.) DPUC has, in earlier decisions, prohibited CLP from passing on these costs associated with the nuclear outages to ratepayers. (See Docket No. 96-08-01, 96-10-06, DPUC Investigation into Whether the Connecticut Lightand Power Company has Fulfilled its Public ServiceResponsibilities with Respect to its Nuclear Operations, July 30,1997.
In this case, the DPUC, by allowing CLP to maintain the over-earnings cash flow through accelerating amortization, was admittedly recognizing CLP's financial straits. "The department is cognizant of the company's (CLP's) financial condition while its nuclear plants are not operating and its need to procure substantial quantities of replacement power."
This case is determined by whether the DPUC, in an interim rate decrease proceeding under § 16-19(9), has the discretion CT Page 1410 to address an interim over-earnings scenario in this fashion.
"The standard of review of an agency decision is well established. Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statutes' purposes. . . . An agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny the agency is not entitled to special deference. . . . It is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Brackets omitted; citations omitted; emphasis omitted; internal quotation marks omitted.)Assn. of Not-For-Profit Providers for the Aging v. Dept. ofSocial Services, 244 Conn. 378, 389 (1998).
The OCC appeal is limited to the DPUC application of §16-19(9). In its brief, OCC claims that the decision violates the statutes direct benefit rule, rate decrease rule, and renders the statute meaningless. (See Brief of the Plaintiff, Office of Consumer Counsel, pp. 11-27.) The court concludes that §16-19(g) does not preclude the DPUC from non-cash rate adjustments and that the DPUC interim rate decision does not violate such statutes.
The evaluation of the DPUC decision requires consideration of the nature of regulatory assets. The basic principle of rate-making is that a regulated public utility is entitled to recover from ratepayers all prudently incurred operating and capital costs.[3] Thus, with a sudden change in operating or capital costs, rates may increase dramatically under traditional rate-making. In an effort to avoid "rate shock," a system of deferrals to gradually implement increases has developed. One principle means of deferring an increase in utility costs is through the creation of regulated assets. The "rate shock" which would have resulted from the nuclear construction program was alleviated by the creation of regulatory assets. (The DPUC Investigation into Retail Electric Transmission Service No. 93-09-29.) The construction of the Millstone 3 nuclear generator would have resulted in a 27% rate increase, which was phased in CT Page 1411 over five years. (Application of the Connecticut Light and Power Company to Increase Its Rules and Revenues No. 85-10-22.) The utility's entitlement to cash reimbursement is deferred through creation of a regulatory asset.
The DPUC has recognized that such deferrals and creation of regulatory asset, though ameliorating "rate shock," can pose future burdens in terms of both ultimate repayment and return on outstanding assets. (See Docket No. 92-11-11 dated 7-1-96.) In dockets too numerous to cite, the department has deferred from present rates certain legitimate, proven expenses so as to avoid steep fluctuation in customers' bills. Such deferred expenses accumulate carrying costs, adding to the burden on future ratepayers.
The Supreme Court noted the amortization of extraordinary expenses to avoid "rate shock" in Connecticut Light Power Co.v. Public Utilities Control Authorities, 176 Conn. 191 (1978). The court found that: "For the expenses of the storm, during the three-year period commencing December 1, 1973, HELCO was allowed to amortize $1,029,457 annually and CLP, $1,690,359 annually. For the expenses of the Millstone outage, during the five-year period commencing January 1, 1973, HELCO was allowed to amortize $1,160,000 annually and CLP, $2,127,000 annually." ConnecticutLight Power Co. v. Public Utilities Control Authority, supra, 208; see also Connecticut Light Power Co. v. Department of Public Utility Control, 40 Conn. Sup. 520, 530 (1986).
Understanding the concept of regulated assets facilitates an appreciation of the DPUC treatment of two of such assets in this decision. The context in which this interim rate decision was made involved the precarious financial circumstances of CLP coupled with the existence of substantial outstanding regulated assets.[4] The decision in preserving the CLP cash flow and reducing the regulated assets is certainly a reasonable resolution of the interim rate issue However, OCC asserts that such resolution is prohibited by § 16-19(g).
OCC seeks to avoid the discretionary mandate to DPUC, namely that the "DPUC may order an interim rate decrease," by emphasizing the proceeding sentence "at such hearing the company shall be required to demonstrate to the satisfaction of the department that earning such a return on equity or collecting rates which are more than just, reasonable and adequate is directly beneficial to its customers." OCC argues that the CT Page 1412 company failed to meet its burden and that the accelerated amortization is at best only indirectly beneficial to its customers.
OCC's arguments fail across the board. The accelerated amortization is a direct benefit to ratepayers in that it reduces a liability to ratepayers and removes from the rate base an asset for which the public utility receives a return of equity. The DPUC decision also does not result in the imposition of rates which continues to be more than just, reasonable and adequate. The use in rate calculations of regulated assets is a traditional means of rate-making. It has been used to lower rates thus avoiding "rate shock" and is available to avoid interruptions of income streams necessary for the survival of the utility. Following the decision and the acceleration of amortization the rate is just, reasonable and adequate, subject to final determination in the full rate case.
Finally, General Statutes § 16-19(g) does not mandate the automatic removal from cash flow of any excess rate. Such direction appears nowhere in the statute and is contradicted by the discretion specifically afforded the DPUC in § 16-19(g).
The decision is affirmed and the appeal is dismissed.
______________________ Robert F. McWeeny, J.