## MAINE WATER COMPANY

v.

## PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

June 26, 1978.

Drummond, Woodsum, Plimpton & MacMahon by Daniel T. Drummond, Jr. (orally), Thomas H. Allen, Daniel Amory, Portland, for plaintiff.

Thomas R. Gibbon (orally), Public Utilities Commission, Horace S. Libby, Sanborn, Moreshead, Schade & Dawson, Augusta by Peter T. Dawson (orally), Richard B. Sanborn, Augusta, for intervenors, inhabitants of Town of Freeport and inhabitants of Town of Wiscasset.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

DELAHANTY, Justice.

Maine Water Company (Company) seeks review of a Public Utilities Commission (Commission) rate case decision pursuant to 35 M.R.S.A. § 303 (§ 303) and 35 M.R.S.A. § 305 (§ 305). Although we commend counsel for the principal parties for the quality and thoroughness of their briefs, the issues before us today have been resolved or extensively addressed in two recent decisions, *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302 (1978), and *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). Accordingly, we affirm the Commission's decision in its entirety.

On October 3, 1975, the Company filed with the Commission a proposed schedule of

rates designed to produce annual revenues of $800,570.00, an increase of approximately $200,000.00. Pursuant to 35 M.R.S.A. § 69, the Commission suspended the rates for three months from November 3, 1975 and for a further five months from February 3, 1976. Hearings on the proposed rate increase were held in March and April of 1976. The towns of Oakland, Damariscotta, Newport, Freeport, and Wiscasset were granted permission to intervene and participated in the hearings. The intervenors urged the Commission to set annual rates of $657,052.00. On July 2, 1976, the Commission issued a decision (Decree) disallowing the Company's proposed rates as unjust and unreasonable and authorizing the Company to file a new schedule of rates which would produce revenues of $712,220.00. On July 14, 1976, the Company filed a revised rate schedule designed to generate the allowed revenues, which schedule was made effective by the Commission's Supplemental Decree dated July 19, 1976. The Company's Petition for Reconsideration and Rehearing filed on July 22, 1976 was denied by the Commission on August 6, 1976 (Order of Denial). On August 13, 1976, the Company filed a notice of appeal under § 303 from the Commission's Decree, Supplemental Decree, and Order of Denial. On the same date, the Company also filed a complaint pursuant to §305 alleging that the rates allowed and approved by the Commission were unjust, unreasonable, confiscatory, and unlawful.

## I.

■ Before reaching the substantive issues raised by the Company, we consider and reject as we did in *Central Maine Power Co. v. Public Utilities Commission, supra,* and *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* the Commission's procedural argument that the Company's § 303 appeal and § 305 complaint are untimely.

Under §303, appeals must be brought within thirty days from the entry of final judgment. The Commission erroneously treated the July 2 Decree as the final judg-ment thus rendering the August 13 appeal untimely. The July 2 Decree was not, however, the Commission's final decision since "it did not resolve . . . the rate cases in the sense of approving of a particular schedule." *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1087. Under our analyses in *Central Main Power Co.* and *Mechanic Falls Water Co.,* it is evident that the July 19 Supplemental Decree approving the revised rates constituted the Commission's final decision from which a § 303 appeal could be taken. The Company's August 13 appeal, coming within thirty days of July 19, was therefore timely.

For similar reasons, the Company's § 305 complaint of August 13 was timely filed. Under § 305, a complaint must be filed "within 30 days of the said ruling or order . . . ." Although there is no finality requirement under § 305 as there is under § 303, *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1090, the Company clearly and appropriately was focusing on the alleged confiscatory rates *approved* by the Commission's July 19 Supplemental Decree. Accordingly, the Company acted within the required time frame.

## II.

■ The Company files its federal income tax return on a consolidated basis with its parent, Consumers Water Company (Consumers), and eighteen of Consumers' subsidiaries. By use of the consolidated return, the profits and losses of the Consumers group are commingled and Consumers pays a tax at 48% of the commingled net income. The Company has stipulated that this consolidated tax arrangement results in tax savings, *viz.,* the consolidated group has paid less in federal income tax than the aggregate taxes would have been had each of the affiliated corporations filed separately. Nevertheless, the Company sought a 48% tax rate as if it were filing separately. The Company alleges that it was error not to allow the full statutory rate.

In *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1091–1095,

we considered this very issue of the consolidated income tax return and approved the Commission policy which it has continued in this case of permitting an income tax expense which generally reflects a subsidiary's proportionate share of the consolidated group's actual tax liability.

Included in the just and reasonable rates of 35 M.R.S.A. § 51 are the properly incurred expenses of a utility in providing a service to its customers. One of the expenses is federal income tax. The Companies chose to pay their income tax on a consolidated basis. This choice resulted in a lesser total tax being paid by the consolidated group than would have been due if each member of the group had filed an individual return. The expense to be passed on to the Maine customers was therefore a proportionate share of the tax liability of the entire group. To require the customers to "reimburse" the Companies at the hypothetical 48% rate would result in a windfall to the Companies and I.U. and would conflict with a basic rate-making principle that rates are to be set on the basis of expenses actually incurred. *Id.* at 1094.

In the instant case, the Commission arrived at a 38.4% federal income tax rate by use of the "chronic loss" theory, a methodology that we considered at length and specifically approved in *Mechanic Falls Water Co. v. Public Utilities Commission, supra.* In the absence of any allegation of error in the application of the theory, we currently decline to further consider the Commission's approach. We therefore sustain the finding of the Commission in regard to its treatment of the Company's consolidated tax return.

### III.

■ The Commission disallowed $2,452.00 worth of depreciation on contributed property. The Company alleges that this ruling is erroneous and confiscatory.

In *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* we also considered this issue of depreciation on contributed property, *i. e.,* property a utility validly acquires by way of voluntary contribution. We there approved of the Commission's view that, at least for rate-making purposes, the aim of depreciation with its resultant accumulation of a depreciation reserve is to permit a utility to recover its original investment in the property and not to replace such property at the expiration of its useful life. *Id.* at 1104. Since the Company in the instant case did not make the original investment in the contributed property, it has nothing to recover through depreciation. The Commission committed no error, therefore, in disallowing this depreciation.

### IV.

■ The Company raises a number of arguments in support of its position that the cost of equity allowed by the Commission was confiscatory, erroneous as a matter of law, and not based on substantial fact.

The principal witness testifying on the cost of equity was John van C. Parker, the Company's vice-president and an officer and director of Consumers. Malcolm R. Horton, a certified public accountant, testified for the intervenors. Mr. Parker urged the Commission to adopt a 15%–17% cost of equity with a separate allowance for attrition and regulatory lag[1] of .53% which was subsequently amended to 1.18%. The intervenors, through Mr. Horton, proposed a 12% cost of equity with no extra adjustment. Accepting neither recommendation, the Commission set a 13% cost of equity which included an unspecified allowance for attrition and regulatory lag. The Commission made a further adjustment for these fac-

---

1. When the Company testified at the hearing, it also included a general adjustment factor in its attrition-regulatory lag request. This factor included 1) an adjustment for unanticipated elements that would adversely affect the rate of return over and above the normal risk of equity capital, 2) an incentive for good management, and 3) an allowance so that the Company could restore its posture in the financial community. On appeal, the Company appears to have abandoned this general adjustment factor and focused solely on attrition-regulatory lag.

tors by using a year-end rate base and by bringing expenses up to date.

Preliminarily, we note that the Commission's staff's participation in this phase of the rate hearing was by cross-examination. It did not present any witnesses of its own. The staff, of course, is not required to introduce any direct evidence in a rate case proceeding for the burden of proof is upon the utility to demonstrate that its proposed rate increase is just and reasonable. 35 M.R.S.A. § 307. If the staff chooses not to present a case-in-chief, the Commission is not bound to accept the uncontradicted testimony of the utility but is free to weigh the evidence, determine the credibility of the utility's experts, and draw its own independent conclusions. *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 540 P.2d 775 (1975); *State ex rel. Utilities Commission v. Duke Power Co.,* 285 N.C. 377, 206 S.E.2d 269 (1974); *cf. Kittery Electric Light Co. v. Assessors of Kittery,* Me., 219 A.2d 728 (1966); *Market St. Ry. Co. v. Railroad Commission,* 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). Such conclusions, however, must be sufficiently warranted by the evidence to withstand our § 303 and § 305 scrutiny.

In many instances, it appears to be the staff's practice to present witnesses or other testimony on such key issues as rate of return and attrition. *See, e. g., Central Maine Power Co. v. Public Utilities Commission, supra; Mechanic Falls Water Co. v. Public Utilities Commission, supra; Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 136 A.2d 726 (1957). Such a practice has the advantage of permitting positive evidence to be introduced for the Commission's consideration. Having chosen not to present a case-in-chief, the staff was relegated to cross-examining the Company's witness. Although in some instances this practice may leave the record so barren that it would not support a Commission decision substantially at odds with a utility's testimony, in the instant case statements and admissions on direct and cross-examination, coupled with reasonable inferences from all of the evidence introduced at the hearing, create the type of record that adequately passes appellate muster.

In arriving at a 15%–17% cost of equity, Mr. Parker used as support various earnings-price ratios from other water and electric utilities. However, the Commission in its Decree correctly observed that the earnings-price ratios of other water companies supported a cost of equity substantially below the Company's recommendation and, in fact, below the level set by the Commission. As for electric companies, Mr. Parker apparently distinguished them from the Company but nevertheless argued that they supported his recommended cost of equity. However, a reading of the record simply does not support this contention. Even assuming that electric utilities' earnings-price ratios were relevant evidence on the Company's cost of equity, their ratios were in line with or slightly below the cost of equity approved in the instant case.

Included in the Company's 15%–17% cost of equity was a "dilution" adjustment. According to Mr. Parker's testimony, dilution occurs when the net proceeds of a sale of stock after deducting costs of issuance are less than the stock's book value. In that event, the book value per share of existing shareholders is reduced or "diluted." To alleviate this problem, the Company increased the earnings-price ratio by 10%–25%.

Had the Company introduced significant evidence supporting its dilution factor, it might have been error for the Commission not to make a compensatory adjustment in the Company's cost of equity. *See New England Telephone and Telegraph Co. v. Department of Public Utilities,* Mass., 354 N.E.2d 860 (1976). However, our reading of the record fully comports with the Commission's conclusion that "[t]here was . . . no persuasive testimony supporting the [dilution adjustment]."

As in many other areas of rate setting, the determination of the cost of equity depends in the final analysis upon the informed judgment of the Commission. *Mechanic Falls Water Co. v. Public Utilities Commission, supra.* Judgment plays a par-

ticularly significant role where there is no quoted market price for the Company's common stock because it is wholly owned by its parent, Consumers. *See Boston Gas Co. v. Department of Public Utilities*, 359 Mass. 292, 269 N.E.2d 248 (1971). On the record before us, we are entirely satisfied that the Commission's determination of a 13% cost of equity, which includes an attrition-regulatory lag allowance described hereinafter, is completely supported by the record.

■ Above and beyond the Company's requested cost of equity, it desired a further adjustment for attrition-regulatory lag. Although the Commission made an adjustment in the cost of equity, used a year-end rate base, and brought expenses up to date, the Company alleges that the overall adjustment was not sufficient to adequately compensate for these factors. We disagree.

Our first reference to the problem of attrition occurred in *Central Maine Power Co. v. Public Utilities Commission*, 382 A.2d at 316. We there noted that attrition is the tendency of the actual rate of return to diminish and is primarily caused by steadily increasing construction costs and a calculation of the rate of return in the year prior to that for which the return is calculated.

> By another definition,
>
> [a]ttrition is the term applied to the reduction in the rate of earning resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates from the company's point of view. *Baltimore Gas and Electric Co. v. McQuaid*, 220 Md. 373, 381, 152 A.2d 825, 829 (1959).

*See New England Telephone and Telegraph Co. v. Department of Public Utilities*, 331 Mass. 604, 121 N.E.2d 896 (1954); *State v. New Jersey Bell Telephone Co.*, 30 N.J. 16, 152 A.2d 35 (1959); *Narragansett Electric Co. v. Harsch*, 368 A.2d 1194 (R.I.1977).

Regulatory lag is the loss of earnings that occurs between the time a utility files for a rate increase and the date when the new rates actually become effective. *State v. New Jersey Bell Telephone Co., supra.*

The Commission does not deny that a utility is entitled to an appropriate adjustment for any proper attrition-regulatory lag that can be shown. The Commission's position, however, with which we agree, is that the Company never proved that it was entitled to any greater adjustment than that which was in fact granted by the Commission.

In the instant case, the Company's proof of attrition-regulatory lag was not substantial. Mr. Parker explained that the 1.18% was derived by averaging the attrition-regulatory lag factors of three different water companies, two of which were out of state. He did not base his recommendation on past attrition-regulatory lag experiences of the Company although on cross-examination he did concede that attrition depends upon the experiences of the individual utility and regulatory lag varies according to the practices and procedures of the various state public utility commissions. We concur with the Commission's finding that this proof of the attrition-regulatory lag was entitled to little weight where there was no testimony concerning the data's relevancy to the earnings of the Company.

Moreover, the derivation of the 1.18% figure is itself questionable. It was not based upon attrition-regulatory lag adjustments allowed by the different commissions but was basically derived by computing the differences between the rates of return authorized for the companies and the rates that were in fact earned. Although a failure to earn the authorized rate of return is evidence of attrition, it is not conclusive. *Public Service Commission v. Baltimore Gas and Electric Co.*, 273 Md. 357, 329 A.2d 691 (1974). The differences between the permitted and earned rates of return could have been due to a variety of factors. Attrition and regulatory lag were only possible explanations.

That the Company's methodology was flawed does not obviate the Commission's responsibility of adequately compensating the utility for any attrition-regulatory lag that the Company was in fact experiencing.

*New England Telephone and Telegraph Co. v. Department of Public Utilities*, Mass., 354 N.E.2d 860 (1976). Use of a year-end rate base, *New England Telephone & Telegraph Co. v. State*, 113 N.H. 92, 302 A.2d 814 (1973), bringing expenses up to date, *Public Service Commission v. Baltimore Gas and Electric Co., supra*, and increasing the otherwise allowable rate of return through an adjustment in the cost of equity, *New England Telephone and Telegraph Co. v. Public Utilities Commission*, 116 R.I. 356, 358 A.2d 1 (1976), are all permissible methods for making an attrition-regulatory lag adjustment. These adjustments were sufficient, in the instant case, to account for such attrition-regulatory lag as did, and would likely, occur.

The Company complains that the Commission erred in not making a specific finding as to the precise factor it was permitting for attrition-regulatory lag. On the meager supporting evidence [2] introduced in the instant case, we do not need a separate finding to conclude that the Commission's various adjustments adequately compensated the Company.[3]

## V.

■ The Commission found that many of the issues raised by the Company had been decided in previous Commission decisions. It permitted the Company all of its expenses associated with the instant rate case but announced that expenses associated with "superfluous relitigation" would not be allowed in future cases. The Company alleges that the Commission's prospective ruling is erroneous as a matter of law under § 303.

In *Lewiston, Greene, and Monmouth Telephone Co. v. New England Telephone and Telegraph Co.*, Me., 299 A.2d 895 (1973), we concluded that the Court would not exercise its § 305 jurisdiction on those issues that were not ripe. There was no suggestion that ripeness did not equally apply to an appeal brought under § 303. Indeed, quite to the contrary, we stated:

> There has developed, separate from the "finality" principle applicable in the conventional "appeal" situations, an independent principle which controls the appropriateness of collateral judicial intervention in the activities of administrative bodies,—a principle predicated on whether the action of the administrative tribunal has achieved the stage at which it might be thought *"ripe"* for judicial consideration and action. *Id.* at 907. (emphasis in original).

As expressed by the United States Supreme Court in the leading case of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the doctrine of ripeness

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Id.* at 148–49, 87 S.Ct. at 1515.

The inquiry in any case where ripeness is in issue should focus on "the fitness of the

---

**2.** *See Boston Gas Co. v. Dep't of Pub. Utils., supra*, for an example of the type and quantum of evidence introduced by a utility which would necessitate an attrition allowance.

**3.** The present case is not one like *State v. N. J. Bell Tel. Co., supra*, or *New England Tel. & Tel. Co. v. State, supra*, where there was no indication of whether the commissions compensated for attrition. Here, there was a square finding by our Commission that it was adjusting for attrition-regulatory lag.

By our decision today, we are not implying that it will never be necessary for the Commission to indicate by separate findings the permitted allowances for attrition-regulatory lag. In some instances, it may be impossible for us to meaningfully perform our required § 303 and § 305 review without this information. *Compare New England Tel. & Tel. Co. v. Pub. Utils. Comm'n, supra*, where the Rhode Island Supreme Court found that the separate attrition allowance of 0.3%, which was added to the utility's rate of return, was not substantiated by the evidence, *with Pub. Serv. Comm'n v. Baltimore Gas & Elec. Co., supra*, where the Maryland Court of Appeals upheld a variety of adjustments although no separate attrition-regulatory lag finding was made.

issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

In *Lewiston, Greene, and Monmouth Telephone Co. v. New England Telephone and Telegraph Co., supra,* we found the Commission's order fit for judicial determination because the order revealed "an avowed commitment by the Commission to effectuate its own plan in accordance with controlling principles, formulas, and computations meticulously prescribed in the Order." *Id.* at 908. By contrast, the Commission's prospective ruling in the instant case is not a specific order revealing an "avowed commitment" but a policy statement of what the Commission intends to do in the future. The policy has not and may never be applied.[4] Moreover, even if the policy is ultimately applied, it is unlikely that the general policy statement, without corresponding factors and criteria, is the Commission's final position. The statement's nonspecific nature suggests that the Commission's ruling is still under meaningful refinement and development. Its tentativeness indicates that the ruling is not yet ripe for review. *See Pacific Gas & Electric Co. v. Federal Power Commission,* 164 U.S.App. D.C. 371, 378, 506 F.2d 33, 40 (1974).

Another factor in determining if a matter is fit for resolution is whether the question presented is "purely legal." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. 1507. Where an issue does not turn upon a specific factual situation, there may be little gained in postponing judicial consideration. *See Continental Air Lines, Inc. v. Civil Aeronautics Board,* 173 U.S.App.

D.C. 1, 522 F.2d 107 (1974). The Commission's ruling, however, does not present a clear-cut legal issue but depends upon the justness of the rule as applied. As such, the ruling requires a framework of concrete facts within which the Company's allegation may be appropriately considered.[5]

The other *Abbott Laboratories* factor is the hardship to the parties of withholding judicial consideration. In *Lewiston, Greene, and Monmouth Telephone Co. v. New England Telephone and Telegraph Co., supra,* the Commission's order resulted in an immediate and substantial financial burden to the utility. The Commission's current ruling, although not imposing any immediate financial burden, is coercive insofar as it may impede the Company or other utility from fully and freely litigating all issues of importance to it. Under the present circumstances, however, the ruling is not so onerous as to outweigh the substantial interests in postponing review until the question arises in a more concrete and final form.

Due to a lack of ripeness, we decline to reach the Company's allegation.

The entry is:

Section 303 appeal denied; judgment of the Public Utilities Commission affirmed.

Section 305 complaint denied; judgment for the defendant Public Utilities Commission.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

---

4. We do not, however, mean to imply that an agency's ruling or regulation will never be ripe merely because it has yet to be applied in a particular case. *See Flemming v. Fla. Citrus Exch.,* 358 U.S. 153, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958), where an administrative order was reviewed prior to its effective date.

5. That the Commission's policy statement does not present simply a question of law but depends upon particular factual circumstances is evident from *Ohio Gas Co. v. Pub. Utils. Comm'n,* 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935).

Thus viewing [the expenses of rate litigation], we think they must be included among the costs of operation in the computation of a fair return. The company had complained to the commission that an ordinance regulating its rates was in contravention of the statutes of the state and of the Constitution of the nation. In that complaint it prevailed. The charges of engineers and counsel, incurred in defense of its security and perhaps its very life, were as appropriate and even necessary as expenses could well be.

*A different case would be here if the company's complaint had been unfounded, or if the cost of the proceeding had been swollen by untenable objections. Id.* at 73, 55 S.Ct. at 321 (emphasis supplied).