**CENTRAL MAINE POWER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION**
**et al.**

Supreme Judicial Court of Maine.

Argued March 14, 1980.

Decided July 2, 1980.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Gerald M. Amero orally, John S. Upton, Portland, Seward B. Brewster, Augusta, for plaintiff.

Stephen A. Johnson orally, Horace S. Libby, Cushing Pagon, Augusta, for Public Utilities Commission.

Southard, Hunt, Hebert & Hayes by Frank E. Southard, Jr. orally, Augusta, for Keyes Fibre Co. and Scott Paper Co.

Perkins, Thompson, Hinckley & Keddy by D. Brock Hornby orally, Thomas B. Wheatley, Portland, for St. Regis Paper Co.

Paul A. Fritzsche orally, Pine Tree Legal Assistance, Inc., Lewiston, for Consumer Action Coalition.

Verrill & Dana by Roger A. Putnam, Portland, for Scott Paper Co.

Before GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ., and DUFRESNE, A. R. J.

NICHOLS, Justice.

St. Regis Paper Company, Keyes Fibre Company and Scott Paper Company, three industrial customers of Central Maine Power Company and intervenors in the present rate proceedings before the Public Utilities Commission,[1] appeal pursuant to 35 M.R.S.A. § 303 from the Commission's August 22, 1979, Supplemental Order No. 4, approving the utility's proposed new rate schedule. The focus of this appeal is upon the "rate design" portion of the Order which on a uniform percentage basis to all customer classes allocates the revenue increases permitted by the order. The Intervenors contend that the Commission's rejection of the utility's proposed rate design in the absence of evidence to support any alternate design was unreasonable and erroneous as a matter of law, because there was substantial evidence on the record to support acceptance of the utility's proposal. They further assert that the uniform percentage increase imposed by the Commission is unreasonable and unjustly discriminatory as a matter of law because that design is not supported by "substantial evidence" on the record.

We affirm the Commission's decision.

## I. Procedural History, Facts and Issues

This rate case was previously before us in *Central Maine Power Company v. Public Utilities Commission*, Me., 405 A.2d 153 (1979). On that consolidated appeal, the utility and several intervenors challenged the Commission's disallowance of the revised schedule of rates filed by the utility on January 16, 1978. In this original rate schedule, filed pursuant to 35 M.R.S.A. § 64, the utility requested increased revenues of approximately 25 million dollars and proposed a new rate design by which the utility would allocate the requested revenue increase by varying percentages among its seven major classes of customers[2] in such a way as to decrease alleged disparity in the rates of return among those customer classes. The proposed design was supposed to bring each class closer to the system average rate of return so that no class would have to shoulder more than its fair share of the utility's cost of providing electricity. The increases ranged from 3.7% for the GS–1 and GST classes to 17% for the residential class.

In support of its proposed allocation of the revenue increase by varying percentages, the utility submitted to the Commission a cost of service study prepared by Frederick E. Anderson, Director of the utility's Rate Department [the "Anderson Study"]. This cost of service study, based on a 1977 test year, purported to show the relationship of the rates of return among the various customer classes.

The Anderson study attempted to assign responsibility to the various rate classes for the embedded costs of providing each class with service. By comparing the total costs assigned to each class with the revenues collected from each class, the utility determined the rate of return it earns from each class of service. The proposed rates allocated the greatest portion of the revenue increase to the classes generating the lowest rate of return and the least portion to those generating the highest rate of return. In

---

1. Hereinafter the three paper companies will be referred to as the "Intervenors"; Central Maine Power Company will be referred to as "the utility"; the Public Utilities Commission will be referred to as the "Commission."

2. The seven rate classes are residential, small general service (GS–1), medium general service (GS–2), large general service (GS–3), general service transmission (GST), municipal lighting and private area lighting. The Appellants here belong to the GST class, representing the utility's largest individual customers.

this way, the utility hoped to relate the electric rate paid by each class more closely to the cost of providing electricity.

The process of determining the rate of return for each class was complex. All costs were divided into one of several functions (e. g., power supply, transmission, distribution). Each of the functions was then "classified" in order to determine whether it had demand, energy, or customer components. Finally, all costs were allocated to the various customer classes by means of allocation factors which are derived by various methods depending upon the function and classification of the cost.

A significant portion of the overall costs of providing electrical service is classified by the utility as "demand" cost. The Anderson Study employed the so-called "one-hour coincident peak method" in allocating to each class its portion of total demand costs generated during the 1977 test year. Under this method, the utility first determined the one hour during the entire test year when demand for electricity was at its peak. In 1977, the one-hour coincident peak occurred between 5:00 P.M. and 6:00 P.M. on December 12. The utility next determined the number of kilowatts each class was demanding at that particular peak hour, and from this information calculated the proportion of each class's contribution to the utility's demand costs during that one hour.

The "one-hour coincident peak method" of allocation assumes that the load usage during the single hour of the annual system peak is representative of each class's responsibility for costs over the entire year. The Anderson study, therefore, took the proportionate contribution to cost of each class during the one peak hour and assigned total test year costs to each class in the same proportions. It then compared the costs assigned to each class with the revenues collected from each class and determined their various rates of return.

The utility employed the results of the Anderson Study in designing the allocation among the classes of its proposed revenue increase. The utility compared the rates of return calculated by Anderson with its overall average rate of return, and assigned the proposed additional revenues in varying amounts to the different classes in such a way as to bring each class's rate of return closer to the system average.[3]

From May 8, 1978, through August 9, 1978, the Commission held 27 days of hearings, pursuant to 35 M.R.S.A. § 69, on the utility's revised schedule of rates. Much of the testimony and many of the exhibits concerned the new rate design proposal. The utility and the Intervenors presented several expert witnesses and introduced into evidence a number of exhibits on the issue of rate design. The Commission staff also presented its own expert witness. The witnesses were in general agreement that the allocation of revenues to each customer class should reflect the cost of serving that

**3.** The utility submitted an exhibit which *inter alia* shows the following effect of its proposed design:

| Class of Service | Rate of Return | | Rate of Return Differential from Total Maine Jurisdictional | |
|---|---|---|---|---|
| | Present (4) | Proposed (5) | Present (6) | Proposed (7) |
| 1. Residential | 5.35 | 8.36 | (2.15) | (1.77) |
| 2. Small General Service | 12.03 | 12.93 | 4.53 | 2.80 |
| 3. Medium General Service | 10.56 | 12.39 | 3.06 | 2.26 |
| 4. Large General Service & Transmission General Service Combined | 10.15 | 12.70 | 2.65 | 2.57 |
| 5. Municipal Lighting | 8.36 | 10.06 | 0.86 | (0.07) |
| 6. Private Area Lighting | 8.06 | 10.07 | 0.56 | (0.06) |
| 7. Total Maine Jurisdictional | 7.50 | 10.13 | | |

class; that the rates of return among the customer classes were not currently equivalent; and that the evidence tended to show the residential rate of return was below the system average and the general service transmission (GST) rate of return was above the system average. There were, however, significant differences of opinion as to the best method of computing accurate rates of return. Much of the testimony was grossly technical and need not be elaborated upon in this opinion. A sampling of the varied opinions with which the Commission was faced, however, follows.

Frederick E. Anderson, the author of the Anderson Study, testified in great detail in support of the "one-hour coincident peak method." He said that his objective in preparing the study was to aid the utility in making its rates more cost-related.

Dr. John W. Wilson, an expert in electric utility rate design, testified on behalf of Keyes Fibre Company regarding a "marginal cost study" he had performed on the utility's system in which he calculated the "marginal running cost"[4] for all customers on the system from hour to hour during 1977, using a peak period that encompassed the hours between 8:00 A.M. and 9:00 P.M. on workdays, or 37.7 percent of all hours in the year. Dr. Wilson testified that he used this broad-based peak period in order to "avoid the unnecessarily speculative and, perhaps, unfairly representative procedure of assigning peak costs on the basis of a single hour;" and that since marginal cost rates "are equally applicable to all customers on the system," he avoided the "potential arbitrariness involved in assigning demand costs between customer classes . . .".

Addressing himself to the Anderson Study, Dr. Wilson stated that in comparison with what other electric utility companies around the country are doing, he would give the Anderson proposal a grade of "B"; in comparison with the best scientific methods available, he would give the study a "C minus" or "D"; and, if the Commission wanted to receive an "A" with the industry, it would have to do better than the Anderson Study. Nevertheless, Dr. Wilson said that his "rates tend[ed] to confirm the company's cost of service study."

Michael J. Ileo, an economist and public utility consultant, offered expert testimony on behalf of Maine Oil Dealers Association.[5] He compared the marginal cost study prepared by Dr. Wilson with the Anderson Study. When asked if he thought the Anderson Study was an appropriate basis upon which to determine the utility's costs, he responded, "I would not call it appropriate. I would prefer to call it a method and an acceptable method by which it could be done." He stated that he thought Dr. Wilson's study represented costs more fairly, but stated that if the Commission could not adopt Dr. Wilson's proposal, then he would urge the Commission to adopt the utility's proposal. Mr. Ileo testified that he was in general agreement with *the direction* in which the utility was moving with regard to rate design because it reflected an attempt to deal with the problem of price discrimination; however, he was unable to support the specific *methods* employed in the Anderson Study, "particularly the time definition of the peak period."

George Sterzinger testified as an expert witness on rate design on behalf of the Consumer Action Coalition.[6] Mr. Sterzinger maintained that the Anderson Study's use of the one-hour coincident peak method of determining demand costs resulted in a substantial overstatement of the residential class's responsibility for demand. He advo-

---

4. According to Dr. Wilson, the marginal running cost is the additional cost (primarily the cost of fuel) required to generate one additional kilowatt-hour of electricity at any given hour. The marginal running cost changes from hour to hour, season to season, and year to year.

5. Maine Oil Dealers Association was an Intervenor at the hearings before the Commission and an Appellant in the prior appeal. That Association did not join in the present appeal.

6. The Consumer Action Coalition was an Intervenor at the hearings before the Commission and an Appellant in the prior appeal. This group filed a brief as an Appellee in the present appeal.

cated the use of the so-called Average and Excess Demand Allocation method.

Bruce M. Louiselle, vice president of a consulting firm specializing in public utilities economics, testified on behalf of the Commission staff. He maintained that the one-hour peak was far too narrow a time frame to fairly represent relative demand. He offered evidence to show that on December 12, 1977, the day of the system's one-hour peak, during the entire 13-hour period from 8:00 A.M. to 9:00 P.M., the demand for electricity was in excess of 90% of the one-hour peak between 5:00 P.M. and 6:00 P.M. He concluded that slight changes in the pattern of use for even a single class could shift the one-hour peak and thereby change the relative levels of use as between classes. He recommended that a far broader period of time be used for purposes of allocating costs.

Finally, Dr. Mark Drazen, a consultant in the field of public utility regulation, testified on behalf of St. Regis Paper Company. He had reviewed the Anderson Study and conducted what he called a "sensitivity study" for the GST class to check the accuracy of the utility's calculated rate of return. He computed the rate of return using a demand allocation factor for the GST class 10% greater than the 1977 coincident peak factor, and found that the rate of return for that class was still above the system average. Mr. Drazen also offered an exhibit in response to Mr. Louiselle's testimony concerning the possible effect upon demand allocation of the use of a 13-hour peak demand period on December 12, 1977 (from 8:00 A.M. through 9:00 P.M.), rather than the single peak hour. His exhibit shows a change in the peak allocation factor for the GST class of only 5%. He concluded that the sensitivity study and the cost study show that even under the utility's proposed rates, the residential rate of return is below average and the GST rate is above average.

By decree dated October 13, 1978, the Commission disallowed the utility's schedule dated January 16, 1978, and, acting pursuant to powers conferred by 35 M.R.S.A. § 294, authorized the utility to file revised rate schedules to generate an increase in gross revenue by an aggregate of approximately 15.5 million dollars. The Commission also rejected the utility's proposed rate design. After reviewing all the evidence relevant to a realignment of the rates among the classes, again purporting to act pursuant to 35 M.R.S.A. § 294, the Commission decided to make no change, finding . . . . :

that the use of the one hour coincident peak method for allocating demand costs is so flawed and yet is so significant in the overall result of the cost-of-service study that we are unable to rely on the study as a basis for allocating the revenue increase among the various rate classes. Were the "90 percent of peak" method we have found to be fairer to be used, it is conceivable that the returns earned from the various classes would be very different from the figures the company has presented to us. But we have no way of knowing what they would be. Having rejected the cost-of-service study as a basis for allocation of the revenue increase, we are left in the position of having to make allocations without the aid of any competent cost evidence. Under these circumstances, we find that the only reasonable and fair result is to require that rates be designed so as to give all classes of service the same percentage increase over total test-year revenues.

*Central Maine Power Company Re: Proposed Increase in Rates*, F.C. # 2332, 26 P.U.R. 4th 388, 424–425 (1978).

The utility thereupon filed new rate schedules in accordance with this decree. By Supplemental Orders Nos. 1 & 2, dated October 31, 1978, and December 5, 1978, respectively, the Commission approved the substitute rate schedules. The utility and several intervenors seasonably appealed pursuant to 35 M.R.S.A. §§ 303 and 305 from those final orders. *See id.,* 405 A.2d 155–158. St. Regis Paper Co. was a § 303 Appellant on that first appeal, challenging the propriety of the Commission's allocation on a uniform basis to all customer classes

the rate increases permitted by Supplemental Orders Nos. 1 and 2. In an opinion filed August 6, 1979, we sustained in part the appeal of the utility, authorizing the utility to file revised rate schedules to increase its proposed revenues by an additional $880,000. *Id.*, 405 A.2d at 164–179. In view of this disposition, we declined to express any opinion as to the propriety of the Commission's action on the rate design issue, concluding that the issue could become moot were the utility, in filing its revised rate schedules, to choose to seek a uniform percentage increase or to present revised studies supporting its proposed realignment; or were the Commission, in reviewing the revised schedules, to find a revised study persuasive, or to accept some other form of realignment. *Id.* at 158, 186.

In its Order on Remand, dated August 14, 1979, the Commission authorized the utility to file revised rate schedules in accordance with this Court's August 6, 1979, mandate. The order further noted that "[w]hile the Commission does not require a particular rate design at this point, it does favor an equal percentage increase to all classes of service with no increase in the current residential class customer charge."

On August 15, 1979, the utility filed a new schedule of rates in compliance with the Commission's Order on Remand; the new schedule, however, contained the following disclaimer:

Consistent with the Commission's preference expressed in this Order, and given the relatively small amount of additional revenue allowed, the enclosed rates have been designed to spread the increase in as nearly equal percentages as practicable to the several customer classes. The proposed rate design for various classes of customers which the Company submitted in this case did not provide for the same percentage increase for the several classes of customers, but attempted to reflect the costs of serving different customer groups. This filing should not be construed as an acceptance by the Company of the Commission-mandated rate

structure based on an "across-the-board" increase as more appropriate than that proposed by the Company.

St. Regis Paper Company immediately filed a request for rehearing before the Commission on the rate design issue. St. Regis was joined in its request by Scott Paper Company and Keyes Fibre Company.

On August 22, 1979, the Commission issued Supplemental Order No. 4, approving the utility's revised rate schedule without a hearing. In this final decision, the Commission specifically recognized its duty to approve and order into effect without delay substitute rates which have been found to be just and reasonable. *See Central Maine Power Co. v. Public Utilities Commission,* Me., 382 A.2d 302, 324 (1978). The Order states:

We have received requests for hearing on allocation of revenue among customer classes from St. Regis Paper Co., Keyes Fibre Company and Scott Paper Company. At this point we believe we have a responsibility to approve a revised schedule of rates promptly in order that Central Maine may commence collecting the additional annual revenues which the Supreme Court has required. We do not, however, take lightly the requests for hearing on the allocation issue raised by St. Regis, Keyes and Scott. Therefore, we will keep Docket F.C. 2332 open and will plan to hold hearings as soon as the Commission Staff can prepare its affirmative case on the allocation issue. The Commission has applied for funding under the Federal "Public Utility Regulatory Policies Act of 1978" to investigate the cost of service and electrical rate design issues. We intend to initiate these further hearings as soon as possible and our sincere hope is that this issue will receive attention during this forthcoming fall.

St. Regis Paper Company, Scott Paper Company and Keyes Fibre Company brought timely appeals pursuant to 35 M.R.S.A. § 303 from Supplemental Order No. 4.[7]

---

7. The utility and the Commission moved to dismiss the appeals of Scott Paper Company

and Keyes Fibre Company on the ground that Supplemental Order No. 4 was not a "final

Although Central Maine Power Company is nominally an Appellee on this appeal, that utility joins with the Appellants in arguing that the Commission's rejection of the utility's original rate design proposal and imposition of a uniform increase was unreasonable and unsupported by substantial evidence. Nevertheless, the utility concedes that the Commission was obligated to implement without delay the rate increase finally approved by this Court.

The two issues presented by this appeal overlap to a great degree. These issues are:

(1) Whether the Commission's rejection of the utility's proposed allocation of revenues was reasonable and supported by substantial evidence, in light of the fact that neither the Commission staff nor any other witness at the hearings before the Commission offered any alternative allocation design, and

(2) Whether the Commission's approval of the utility's allocation of the revenue increase on a uniform percentage basis to all customer classes was reasonable and supported by substantial evidence.

## II. The Rejection of the Rate Design

The Intervenors and the utility contend that where, as here, no one at the public hearing, including the Commission staff, provides the Commission with an alternative to the utility's proposed rate design, the utility is entitled to a presumption in favor of its proposal. Otherwise stated, this contention is that where the utility presents expert witnesses who provide substantial evidence in support of its proposal, the Commission staff has the burden of proving that the utility has not complied with the mandates of 35 M.R.S.A. §§ 51 and 61, which sections impose on the utility the

responsibility to prepare and file just and reasonable rate schedules.

In any event, the Intervenors assert, the Commission never found the utility's proposed *allocation* to be unjust or unreasonable, and that the Commission has no power to exercise its authority under 35 M.R.S.A. § 294 to substitute its own allocation unless it first makes an explicit finding that the utility's proposal is unjust, unreasonable, insufficient or unjustly discriminatory, citing *New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 390 A.2d 8, 59 (1978). They maintain that the Commission's rejection of the Anderson Study and the "one-hour coincident peak method" of allocating costs did not constitute a finding that the *actual allocations* suggested by the utility were unlawful. They contend that the Commission's suggestion that a different method *could* have resulted in different demand allocations was insufficient to constitute a finding that the utility's proposed allocations were unjust or unreasonable. St. Regis maintains in its brief that "it is, by definition, impossible to conclude that a particular allocation of a finite sum is unjust or unreasonable without finding that a different allocation produces fairer results." In this case, it is argued, the Commission in its Decree of October 13, 1978, conceded that it was "without the aid of any competent cost evidence" to support its substitute allocation method; therefore, the Commission could not possibly have found that the utility's proposal was unjust or unreasonable.

Finally, the Intervenors urge that the Commission's rejection of the Anderson Study was completely arbitrary, in that the Commission disregarded unimpeachable evidence showing that the utility's proposal reduced cost discrimination. The contention is that this arbitrary and capricious

---

decision of the commission" within the meaning of 35 M.R.S.A. § 303. They maintained that Supplemental Order No. 4 was merely "a ministerial act, implementing our mandate in the prior appeal," and that since these two Intervenors were not parties to that prior appeal, their current appeals must be dismissed as untimely. This Court rejected the argument

and concluded that on the circumstances of this case, Supplemental Order No. 4 is a "final decision." *Central Maine Power Company v. Public Utilities Commission*, Me., 408 A.2d 681 (1979). See also *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1087 (1977).

disregard of facts showing the justness and reasonableness of the utility's proposed rate design is reversible error. *See Maine Motor Rate Bureau*, Me., 357 A.2d 518, 528 (1976); *Central Maine Power Company v. Public Utilities Commission*, 150 Me. 257, 262, 109 A.2d 512, 514 (1954). This argument amounts to a contention that the Commission's rejection of the utility's proposed rate design was not supported by substantial evidence.

■ We conclude that the Commission acted properly in rejecting the rate design proposal submitted by Central Maine Power Company.

■ First, we reject entirely the contention that the utility's proposal enjoyed a presumption of justness and reasonableness. The utility proposed a significant change in rate design. Pursuant to the powers conferred upon it by 35 M.R.S.A. § 69, the Commission held public hearings into the propriety of the proposed change. Section 69 specifically provides:

> At any such hearing involving any change or changes [proposed to be made in any schedule of rates filed with the commission], *the burden of proof to show that such change is reasonable shall be upon the public utility.* (emphasis added).

*See Continental Telephone Company v. Public Utilities Commission*, Me., 397 A.2d 1001, 1007 (1979); *Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483, 493 (1978); *Maine Water Company v. Public Utilities Commission*, Me., 388 A.2d 493, 496 (1978).

■ The absence of an alternative new design with which the Commission might compare the utility's proposal did not relieve the utility of its burden to convince the Commission that its proposed allocation of the revenue increase was just and reasonable. We disposed of this contention in our discussion of the rate design issue the last time this case was before us:

> We may initially conclude that the Commission staff's failure to present a direct case on the proper allocation of the

revenue increase among the rate classes does not constrict the Commission's freedom of decision. Even the uncontradicted evidence of the utility may be weighed, critically examined, and rejected if deemed necessary. *Main* [sic] *Water Company v. Public Utilities Commission*, Me., 388 A.2d 493, 496 (1978). Moreover, our decision in *Maine Motor Rate Bureau*, Me., 357 A.2d 518 (1976) does not require the Commission to accept an uncontroverted allocation study if the evidence supports its rejection. 357 A.2d at 528. Whether the Commission's rejection of the Anderson study and imposition of a uniform increase was reasonable and supported by "substantial evidence" is thus the sole basis of the alleged error.

*Central Power Company v. Public Utilities Commission, supra*, 405 A.2d at 186.

Secondly, we reject as without merit the Intervenors contention that the Commission made no finding concerning the justness and reasonableness of the utility's proposed realignment of the various rate classes. The Commissioner's express rejection of the allocation method employed in the Anderson Study as being "so flawed . . . that we are unable to rely on the study as a basis for allocating the revenue increase among the various customer classes . . .," made clear its finding that the utility had failed to sustain its burden of proving that the proposed change in rate design was reasonable.

Finally, we conclude that the Commission's rejection of the utility's allocation was supported by substantial evidence.

Very recently we have stated the scope of this Court's role in reviewing a decision of the Commission for sufficiency of the evidence:

> First, it is our duty to sustain whatever findings *of fact* underlie the Commission's ultimate determinations on the basis of all of the evidence of record, regardless of the source from which the evidence might have come, if the findings of fact are not clearly erroneous, i. e., are basically supported by the totality of the evidence of record. (citations omitted).

**1248**

Second, insofar as the Commissions' ultimate determinations involve the application of a legal standard to facts found, this Court's responsibility is to review whether the standard applied by the Commission was correctly conceived in accordance with law, and any judgmental aspects of the application will be upheld unless bounds of rationality are exceeded. *Central Maine Power Company v. Public Utilities Commission*, Me., 414 A.2d 1217 (1980).

In the October 13, 1978, Decree, the Commission set forth at least four reasons for finding unfair and unrepresentative the allocation of costs to the seven customer classes based on their relative demand responsibility at the single peak hour:

1. The utility had submitted to the Commission as exhibits "hourly load listings" for each month in 1977, showing the demand on the system for every hour of every day. From these listings, the Commission determined that:

> During thirteen hours in 1977, the system load exceeded 95% of the single hour system peak. On only four of those occasions did the time of day coincide with the time of the annual peak . . .
> Any of the other nine hours . . .
> could easily have been the system peak hour with only minor shifts in load.

*In re Central Maine Power, supra*, 26 P.U.R. 4th at 422. The Commission concluded that the system peak during the test year 1977 was not clear and well-defined, and was, therefore, not clearly representative of the relative demand responsibility among the classes at other hours which approached peak.

2. The Commission found that the demand responsibility for the GST class at the single peak hour was significantly lower than on a "typical weekday," and that allocating costs to that class on the basis of its percentage of demand during that peak hour would not give a true and accurate picture of that class's overall responsibility for the utility's cost of producing electricity. The Commission based this finding partially on the testimony of two Scott Paper Company employees concerning that company's practice of drastically reducing its demand during kilowatt savings time (KST) hours. The KST program is implemented only when the demand for electricity approaches peak. Notwithstanding the KST program's value as a tool in keeping down the cost of electricity by reducing the utility's need to build new generation facilities, the Commission determined that the program affects the relative demand of the large and small classes at the system's peak hours. Illustratively, Scott Paper Company responds to direct telephone calls from the utility at KST requesting a reduction in demand, by switching to its own self-generation equipment. Smaller customers, who depend entirely on radio and television announcements to cut back on electrical demand, clearly cannot so reduce their demand responsibility during peak hours. Furthermore, Scott Paper Company is reimbursed by the utility for the cost of its self-generation at its S.D. Warren Plant during KST. The Commission noted that while that company "should not be charged for the capacity which it supplies to itself, . . . the energy which in theory is purchased by Central Maine and resold to S.D. Warren never is metered." Therefore, the true cost to the utility of that GST customer is not reflected by the "load listings" showing that company's diminished demand at peak hours.

In addition, the utility submitted a "load listing" for October 12, 1977, which was purported to be representative of a "typical weekday." Comparing this day with hours in which the system approached peak, the Commission found that the GST customers consistently cut back on demand at peak and do not make reductions on a typical day. In fact, Fred J. Newhard, Jr., Chief Engineer at Scott Paper Company's Winslow, Maine plant testified that he was "very much" aware that the single peak hour is significant in determining rates of return, and that this fact was "very definitely" a factor in the decision to cut back demand during peak hours.

3. Corresponding to the diminished demand of the GST customers at peak hours, the Commission found that the demand responsibility of the residential class at the peak hour was disproportionately high. The Commission had before it a 1977 study conducted by the utility concerning residential customers who do not use electricity for space or water heating. The peak demand of these customers occurred at precisely the hour of system peak, and was 50% higher than their average demand during other hours when the system load exceeded 90% of the peak hour load.

4. The Commission rejected Frederick Anderson's suggestion that costs should be allocated according to percentage of peak hour demand because the utility must build new plant facilities to meet the peak hour load. The Commission noted that the utility builds new facilities to increase generation capacity in accordance with rules established as part of the New England Power Pool (NEPOOL) Agreement, and not solely on the basis of peak hour demand.

For these reasons the Commission found unreliable the allocation of costs to the seven customer classes on the basis of the single peak hour demand. Unless we conclude that the Commission utterly misconstrued the evidence, it is our duty to sustain its rejection of the "one-hour coincident peak allocation method." We find that the record supports the Commission. The vast difference of opinion among the witnesses at the hearing on the appropriateness of the "one-hour peak method" lends further support to the Commission's finding. We conclude, therefore, that the Commission's rejection of the Anderson Study was not clearly erroneous.

Furthermore, we uphold the Commission's ultimate determination that the utility's proposed allocations were unjust and unreasonable. The proposed allocations were designed to reduce the disparity in the rates of return among the customer classes. However, as we have just seen, the utility's calculations of the various rates of return were based substantially upon an unacceptable method of cost allocation. The Commission decided, therefore, that the utility's proposed realignment of the customer classes on the basis of unreliable statistics was unreasonable. Far from exceeding the bounds of rationality, we conclude that once the Commission rejected the Anderson Study, it had no choice but to reject the utility's proposed rate design.

### III. The Uniform Percentage Increase in Rates

We now reach the issue of whether the Commission's order approving the allocation of the revenue increase on a uniform basis to all customer classes was supported by substantial evidence.

The Intervenors maintain that the order must be overruled because (a) the Commission made no finding as to the justness and reasonableness of that allocation, (b) the record is completely void of any evidence to support the Commission's action, and (c) the uniform percentage allocation is unjustly discriminatory in that it exacerbates the existing imbalance in the rates of return among the customer classes.

The argument of the Intervenors on this issue appears to be grounded in the view that the Commission, after rejecting the utility's proposed rate allocation, was required to develop an alternative rate design different from the design already in existence, and was required to place evidence in the record in support of a new design. We agree with the Intervenors that, were the Commission to substitute a new rate design for the existing one, the Commission staff would have an affirmative duty to develop evidence in the record to support the justness and reasonableness of that new design. Only in this way would the new proposal be subject to review under our standard, i. e., supported by substantial evidence on the record. We are not persuaded, however, that the Commission had an affirmative duty in this case to develop a new rate design. Although we find that the evidence adduced at the hearings before the Commission clearly demonstrates the need for improvement in the method of allocating revenues among the utility's cus-

tomer classes so as to more closely and fairly reflect cost of service, we conclude that under the circumstances of this case the Commission's imposition of a uniform percentage increase onto the existing rate structure was just and reasonable.

We find our reasoning in *Central Maine Power Company v. Public Utilities Commission*, Me., 382 A.2d 302 (1978), dispositive on the question of the propriety of the Commission's action in relation to rate design on remand from our August 6, 1979, decision. In the 1978 opinion, we defined the Commission's role in rate design, and how that role relates to the Commission's duties in a rate investigation pursuant to 35 M.R.S.A. § 64 and § 69. There we held that the Commission committed error when it conducted an investigation into rate design after the utility had filed substitute rates in accordance with the revenue level previously found by the Commission to be just and reasonable, and thereby delayed, beyond the maximum suspension period permitted by § 69, ordering into effect those substitute rates. We decided that the Commission has two primary *duties*:

> (1) to determine whether or not the rates "proposed" in a filing under § 64 are just and reasonable, and, if they are not, to "fix" substitute rates which are just and reasonable; and (2) where the Commission fixes substitute rates, to approve the substitute rates as placed on file and, upon approval, to order the filed substitute rates into effect.

*Id.*, 382 A.2d at 323.

In carrying out these primary duties, the Commission is concerned solely with fixing a total *revenue level* which is just and reasonable. In regard to the Commission's role in determining how the revenues are to be allocated, we there declared:

> That the Commission properly has such a role appears, at least by inference, from the numerous statutory references to "schedules" and the statutory authorization in § 69 for the Commission to investigate the "propriety" of "changes proposed to be made in any *schedule* of rates." (emphasis supplied). This lan-

guage indicates legislative intendment that the rate design among rates, as well as the revenue level they will generate, must be given Commission attention as a facet of "ratemaking."

·     ·     ·     ·

[T]he Commission prevents proposed rates from ever becoming effective by operation of law if the Commission, prior to the expiration of the period during which the effectiveness of proposed rates has been suspended, comes forth with a "basic" or "principal" decree determining that the total revenue level which will be produced by "proposed" rates on file is neither just nor reasonable and fixing a total *revenue level* just and reasonable for substitute rates to generate. Of course, the Commission, *should it have the time*, may see fit to deal in such principal decree also with the matter of the design among rates as they are to be embodied in schedules, either indicating the formal outlines of such design or addressing it more in detail. Rate design is, however, an optional rather than necessary facet of the "principal" decree, as it functions to prevent "proposed" rates from ever becoming effective by operation of law. This being so, the Commission's primary responsibility is to deal on a *high priority* basis with that which is the *necessary* aspect of its principal decree. *The Commission therefore must not delay, pending further investigation of rate design, approving and ordering into effect substitute rates filed by the utility which are found to conform to the total revenue level prescribed by the "principal" decree as just and reasonable.*

*Id.* at 324 (some emphasis in original; footnote omitted)

In the case now before us, the Commission was confronted with a not dissimilar problem. The utility filed a revised schedule of rates, pursuant to § 64, on January 28, 1978. Pursuant to § 69, the Commission, by orders dated February 13, 1978, and May 12, 1978, suspended the proposed rates

for the maximum eight-month period [8] until October 15, 1978, in order to conduct public hearings. The hearings did not conclude until August 9, 1978. Preparation of final briefs and oral argument took until September 7, 1978. The Commission entered its decision on October 13, 1978, two days before the end of the suspension period.

It was not until September 7, 1978, that the Commission had before it all of the evidence and final arguments in regard to the utility's proposed revenue increase and rate design. The Commission thereafter had just slightly over a month in which to digest the mass of highly technical testimony and exhibits submitted over the 27 days of hearings. During this time period, the Commission's *primary* obligation was to fix a just and reasonable revenue level for the utility by either approving the utility's proposed rules, or, as happened here, ordering substitute rates. The Commission's *secondary* obligation was to consider the propriety of the utility's proposed rate design, and, were it to find the utility's proposal unacceptable, as it did, to itself allocate the additional revenues. Of course, in determining how the additional revenues were to be allocated, the Commission was required to see that the allocation was just and reasonable.

■ The burden of proving that a Public Utilities Commission order is unreasonable, unjust or unlawful is on the party seeking to set aside the order. 35 M.R.S.A. § 307, *Central Maine Power Company v. Public Utilities Commission*, Me., 395 A.2d 414, 431 (1978). We conclude here that the Intervenors have not sustained their burden of proving that the imposition of a uniform increase on the existing rate structure was unjust and unreasonable. The Intervenors contend that the existing rate structure is discriminatory. We acknowledge that the record does contain some evidence to support this claim. However, the actual figures in the record which purport to show the disparity in the rates of return among the customer classes are based on cost allocations derived from the "one hour coincident peak method," which method, we have observed, the Commission reasonably found to be unreliable. We must agree, therefore, with the Commission that the record does not accurately reflect whatever discrimination in the rate structure which may exist. Without this information, the Commission was quite simply unable to make any change in the existing rate structure within the time limits in which it had to investigate, approve and order into effect the additional revenues which it had found to be just and reasonable.

We are not unmindful that the Intervenors here and others have been urging the Commission to implement rate design reform for some time. We are not persuaded, however, that the Commission has ignored the issue of rate allocation or neglected its duty to investigate this area of ratemaking. The record before us demonstrates that the Commission gave much time and attention to the consideration of the utility's rate design proposal and to the issue of rate design in general.

Neither are we unmindful of the affirmative duty which both the state and federal legislatures have imposed upon the Public Utilities Commission to investigate and implement reform in the area of electric utility rate design.

Since Maine's Electric Rate Reform Act (P.L.1977, c. 521; enacted in Title 35 M.R.S.A. §§ 91 *et seq.*) became effective on October 24, 1977, the Public Utilities Commission has been required to make improvements in electric utility rate design in order "to relate electric rates more closely to the costs of providing electric service." 35 M.R.S.A. § 92. Section 93 of the Act (as amended by P.L.1979, c. 399) provides in part that:

The commission, as it determines appropriate, shall order electric public utili-

---

8. *See New England Telephone and Telegraph Company v. Public Utilities Commission*, Me., 362 A.2d 741, 748 (1976) ("Section 69 grants to the Commission power to suspend a *proposed* rate *only* for a *maximum* period of 8 months. Nowhere in section 69, or in any other section of 35 M.R.S.A., is the Commission vested with authority to extend a suspension beyond this deadline by *agreement or otherwise.*")

ties to submit specific rate design proposals and related programs for implementing energy conservation techniques and innovations, either in conjunction with or independently of any rate-making proceeding pending before the commission. Such proposals shall, as the commission determines, be designed to encourage energy conservation, minimize the need for new electrical generating capacity, and minimize costs of electricity to consumers, and shall include, but not be limited to, proposals which provide for the development and implementation of:

.   .   .   .   .

2. Marginal costs of service. Rates which reflect marginal costs of services at different voltages, times of day or seasons of the year and including long run marginal costs associated with the construction of new electric generating facilities; . . .

Section 94 (as amended by P.L.1979, chapters 399 and 541) provides further that:

The Public Utilities Commission shall mandate, after notice and hearing on the proposed schedule, a scheduled phasing-in of the improvements in electric utility rate design and related regulatory programs approved under section 93 and is authorized to order utilities to develop and implement electric utility rate design improvements approved by the commission on temporary, pilot and experimental basis, affecting either a portion or all of any class of consumers of any utility as the commission may determine is appropriate to carry out the purposes of this Act, and order other energy conservation techniques, programs and innovations relating to electric public utility service that, in the commission's judgment, are practicable, just and reasonably related to fulfilling the purposes of this chapter. In ordering any rate design improvements, the commission shall consider and assure the revenue requirements of the utility.

On its own initiative or during a rate proceeding, and to the extent that is feasible, the commission shall consider and adopt the federal rate-making standards established in the United States Public Utility Regulatory Policies Act of 1978, Public Law 95–617 [16 U.S.C.A. § 2601 *et seq.*]

If, and to the extent that, the commission should decide not to adopt any of the federal standards referred to in this section, it shall set forth fully and adequately the facts and the rationale supporting the rejection of the standards.

The federal act mentioned in section 94 is generally referred to as PURPA. One of the stated purposes of PURPA is "to encourage equitable rates to electric customers." 16 U.S.C.A. § 2611(3). Section 2621(d) of PURPA provides a comprehensive body of ratemaking standards embodying the most recent scientific developments in electric ratemaking, as guides for State regulatory authorities. 16 U.S.C.A. § 2621(d). Section 2621(a) provides that "[e]ach State regulatory authority . . . shall consider each standard established by subsection (d) of this section and make a determination concerning whether or not it is appropriate to implement such standard to carry out the purposes of this chapter." Each State regulatory authority must commence consideration of the standards, or set a hearing date for such commencement not later than November 9, 1980; and the final determination on the appropriateness of the standards must be completed by November 9, 1981.

We fully recognize that the customers of this utility may feel frustrated by the long and laborious process of affecting reform in the area of electric utility rate design. We must, however, give the Commission full opportunity to investigate and implement standards which it finds appropriate in this highly complex area.

Contrary to the Intervenors' contention that this Court's reluctance to interfere with the Commission's ratemaking duties has "lulled" the Commission into neglecting the area of rate design, the record before us demonstrates that the Commission is fully aware of the need for improvement in electric utility rate design and appears to have resolved to make these improvements as

soon as possible. As the Commissioner who dissented from the Commission's rejection of the utility's rate design proposal, stated, "[t]he Commission [has already] devoted long and sometimes arduous hours in public session on rate design, issue by issue." *In re Central Maine Power, supra,* 26 P.U.R. 4th at 438. Furthermore, in its final Supplemental Order No. 4, the Commission stated,

We do not, however, take lightly the requests for hearing on the allocation issue raised by St. Regis, Keyes and Scott. Therefore, we will keep Docket F.C. 2332 open and will plan to hold hearings as soon as the Commission Staff can prepare its affirmative case on the allocation issue. The Commission has applied for funding under the Federal "Public Utility Regulatory Policies Act of 1978" to investigate the cost of service and electrical rate design issues. We intend to initiate these further hearings as soon as possible and our sincere hope is that this issue will receive attention during this forthcoming fall.

We, in turn, do not take lightly the Commission's promise to initiate this reform as soon as possible. Under the circumstances of this case, however, we conclude that the Commission acted in conformity with the duties imposed upon it by sections 69 and 294, when, without delaying for further investigation into rate design, the Commission ordered the allocation of the revenue increase to be effected on a uniform percentage basis to all customer classes, and thereby maintained within reasonable limits for the time being, the existing rate structure.

The entry is:

Each Section 303 appeal denied.

The August 22, 1979, Order of the Commission affirmed.

All concurring.